Filed 6/21/24

## CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TRC OPERATING COMPANY, INC., et al.,<br><br>  Plaintiffs, Cross-defendants and Appellants,<br><br>  v.<br><br>CHEVRON USA, INC.,<br><br>  Defendant, Cross-complainant and Appellant. | F083724<br><br>(Super. Ct. No. S1500-CV-282520_JEB)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County. David R. Lampe, Judge.

Quinn Emanuel Urquhart & Sullivan, Sara L. Pollock, Kathleen M. Sullivan, Christopher Tayback, Scott L. Watson, B. Dylan Proctor, Valerie Lozano, Dylan C. Bonfigli for Plaintiffs, Cross-defendants and Appellants.

Horvitz & Levy, John F. Querio, Jeremy B. Rosen, Andrea L. Russi, Christopher D. Hu; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Marcellus A. McRae, Thomas A. Manakides, Blaine H. Evanson; Bright and Brown, James S. Bright, Maureen J. Bright, and Kristin G. Taylor for Defendant, Cross-complainant and Appellant.

-ooOoo-

TRC Operating Co., Inc. and TRC Cypress Group, LLC (collectively TRC) and Chevron U.S.A., Inc. (Chevron) are oil producers operating adjacent well fields they own or lease in Kern County, west of Taft. Both companies pump from a shared underground oil reservoir, commonly known as Midway-Sunset oil field, and both engage in a process referred to as "cyclic steaming" to make the extraction process more efficient. This process involves injecting high-pressure steam down a wellbore, which then both fractures the surrounding rock and makes the oil contained in that rock less viscous, making the oil easier to pump out.

In 1999, a "surface expression" formed near a particular Chevron well, known as Well 20. A surface expression occurs when the steaming of the wells causes a lateral fracture from the wellbore, and thus allows oil and other effluent to escape from the wellbore and seep to the surface. Despite Chevron's attempts at remediation, in the summer of 2011 an eruption occurred in the area of the Well 20 surface expression, shooting pressurized steam and oil into the air, like a geyser. This eruption also caused a sinkhole to form, which killed a Chevron employee. Similar eruptions followed over the succeeding months, and the state oil and gas regulator—the Division of Oil, Gas and Geothermal Resources (DOGGR)[1]—issued various orders preventing steaming in the area of the Well 20 surface expression. These orders encompassed land that was leased or owned by Chevron as well as TRC. These shutdown orders lasted four years.

TRC sued Chevron, claiming Chevron's negligent maintenance and operation of its property for many years led to dangerous conditions which made it unsafe to perform cyclic steaming operations. These conditions led to the DOGGR shut-down orders, and to TRC's harm and damages. Chevron countersued, claiming TRC's failure to

---

[1]     DOGGR is now known as the California Geologic Energy Management Division, colloquially called "CalGEM." Since the parties and witnesses largely refer to this regulatory agency using its prior acronym, DOGGR, we will do so as well.

2

adequately maintain its own wells was the cause of the surface expression, the 2011 eruptions, and damages suffered by Chevron.

The case proceeded to a jury trial in 2021. TRC argued Chevron was the sole cause of TRC's cessation of steaming operations from 2011 to 2015. Chevron argued TRC stopped steaming operations solely because of the DOGGR shut-down orders, which were therefore a superseding cause of any harm suffered by TRC. Chevron also argued TRC was the cause of Chevron's harm because it negligently maintained and operated its steaming processes over the years. The jury found in favor of TRC, awarding approximately $120 million in damages against Chevron. Nothing was awarded to Chevron.

Chevron filed motions for a new trial and for judgment notwithstanding the verdict (JNOV). The trial court denied the JNOV, but granted a new trial based on misconduct by Juror No. 10, because he failed to disclose (1) a 40-year-old criminal conviction which would have rendered him ineligible to serve as a juror, because he should have registered as a sex offender and (2) his status as a party to a personal injury lawsuit nine years earlier. TRC appeals the granting of this motion, arguing Juror No. 10 was not ineligible, because the criminal statute under which he was likely required to register as a sex offender was not listed in the juror eligibility statute. TRC also argues no prejudice resulted from the juror's failure to disclose his prior criminal conviction or the previous civil lawsuit. We agree with both arguments.

We interpret the juror eligibility statute to mean that Juror No. 10's out-of-state conviction did not make him ineligible. Also, on the question of prejudice to Chevron, we conclude the trial court used an improper definition of bias in determining prejudice was established. To remedy this legal error, we conduct a de novo review of the record and apply the appropriate definition of bias. Under the circumstances, we conclude Juror No. 10's failure to disclose the prior court cases in which he was involved did not show

3

bias against Chevron or for TRC or bias as to any issue presented to the jury. Alternatively, assuming he was statutorily ineligible, we also would conclude his concealment of information was not prejudicial to Chevron. Accordingly, we reverse the grant of a new trial.

Chevron also filed a protective cross-appeal, in the event we found against it on TRC's appeal. Chevron appealed the denial of its JNOV, arguing that both factually and as a matter of law, DOGGR's orders to stop steaming were the superseding cause of any harm suffered by TRC and precludes it from bearing any liability. We conclude sufficient evidence was introduced to sustain the verdict, demonstrating TRC did not stop any of its steaming operations *solely* because of the DOGGR orders, which were therefore not a superseding cause. We also reject Chevron's claims that (1) the jury instructions on causation were erroneous; (2) the damages awarded were excessive because TRC failed to prove or apportion the amount of damages attributable to Chevron, as distinguished from the amount attributable to the DOGGR orders; and (3) the verdict form lacked critical factual findings necessary for the jury to award prejudgment interest.

We reverse the trial court's order granting a new trial, and remand with instructions to reinstate the judgment against Chevron.

## FACTS

Much of this case relates to a surface expression near Chevron's Well 20. Well 20 was located near the property line between Chevron and TRC, and was a non-operational well that was severely damaged. The first surface expressions formed around Well 20 in 1999, followed shortly thereafter by the first "high energy event"—Chevron's expert explained this meant an eruption of pressurized steam "shoot[ing] up into the air 30, 40, 50 feet like a geyser"—which occurred in February 2000. The current Well 20 surface expression which formed much of the factual predicate for this case originated in July 2007.

4

Chevron first attempted to manage the Well 20 surface expression by using an earthen berm with netting over top of it, and a mechanical pump. Chevron also attempted to "reabandon"[2] Well 20 by pouring cement into it, which failed again to seal off Well 20. Additionally, because of the persistent nature of the Well 20 surface expression, Chevron adopted a policy of not steaming other wells within a 300-foot, and then 500-foot, radius in February 2008 and July 2010.

TRC introduced evidence that the cause of the surface expression was Chevron's failure to appropriately abandon its nearby wells. In particular, TRC pointed to Well 20, which was known to be a damaged well that had to be reabandoned after initial attempts to abandon it failed, allowing steam and oil from other nearby wells to travel at least partially up the wellbore and into the surrounding upper layers of the earth. However, Chevron failed to perform the necessary work on Well 20 in the years prior to the June 2011 eruptions that formed the crisis point in this case. Additionally, Well 202 and Well H235, both owned by Chevron and in the immediate vicinity of Well 20, were inappropriately maintained and/or abandoned, and likely contributed to the Well 20 surface expression. Chevron also attempted to reabandon Wells 202 and H235 at various points, again indicating they were not appropriately abandoned initially.

In October 2010, DOGGR ordered Chevron to fix the Well 20 surface expression. In response, Chevron installed a "French drain" in April 2011, which aimed to eliminate the visibility of the surface expression by collecting the fluids and seep in an underground container which could then be pumped up and taken away. The French drain was not designed to eliminate the problems that caused the surface expression in the first place,

---

[2] "Abandoning" a well refers to the process of sealing off a well that was previously drilled, so that it does not become an unintended ventilation hole for steam that is injected in other, nearby wells. Sometimes that process is unsuccessful for various reasons, leading to what the parties referred to as "reabandonment" of the well, which involves additional attempts to seal off the previously drilled well.

but instead to capture the surface expression close to but below the surface, so that it could not be seen with the naked eye. While French drains often are used to dissipate fluid back into the ground, this one was designed to allow the fluid to be pumped out instead of dissipated.

The French drain did not apparently resolve the problems with Well 20.[3] A few months after its installation, in June and July 2011, steaming in the area of Well 20 caused several explosions or eruptions in the vicinity of the Well 20 surface expression, as well as the opening of a sinkhole which killed one Chevron employee.[4] Witnesses testified seeing a "volcano-like eruption" spewing hot steam out of the area. Chevron had begun steaming Well H235 immediately before these eruptions, which TRC linked to the eruptions because Well H235 was itself damaged and had up to this point been on an internal "do-not-steam" list maintained by Chevron.

Following these eruptions and the death on Chevron's property, in July 2011, DOGGR began issuing orders to curtail the use of cyclical steaming in the vicinity of Well 20.[5] In August 2011, two new surface expressions appeared in the vicinity of Well 20, and additional eruptions occurred, which caused TRC to stop steam injection on its property that was near Well 20 as well. The eruptions and surface expressions occurring on Chevron's property during summer 2011 also caused seep and other fluids to flow onto TRC's property. Following the eruptions, TRC stopped steaming approximately 65 percent of its wells for "safety reasons," tested its wells to ensure they were not the cause

---

[3] The French drain was ultimately removed on or about June 14, 2012.

[4] The death of the Chevron employee was subject to a motion in limine filed by Chevron, and the jury was not told of his death, which was instead simply referred to as an "industrial incident."

[5] These orders, which ultimately banned steaming anywhere within 800 feet of the Well 20 surface expression for a period of approximately four years, are generally referred to throughout as the "DOGGR orders."

of the surface expressions, and took remedial actions to contain the surface expressions that were emerging.  TRC did not resume steaming until July 2015.

## PROCEEDINGS

In July 2014, TRC initiated this litigation by filing a complaint for damages in the Kern County Superior Court alleging claims for negligence, private nuisance, and strict liability against Chevron.  Chevron demurred and in December 2014, the trial court sustained the demurrer and issued a stay based on the doctrine of primary jurisdiction, because related proceedings were then pending before DOGGR.  The case remained stayed for two years, until the court granted TRC's motion to lift the stay in December 2016 and granted TRC leave to amend.  An amended complaint was later filed, adding a claim for trespass and making other changes.  In May 2017, Chevron filed a cross-complaint for negligence, trespass, nuisance, and declaratory relief.

In November 2020, TRC filed its operative second amended complaint. Chevron's answer included a general denial and several affirmative defenses, one of which alleged the DOGGR orders were the superseding cause of any damages suffered by TRC.

After extensive discovery and litigation, the case proceeded to trial in July 2021. The case was submitted to the jury on Friday, September 17, 2021, with the jury returning a general verdict the following Monday, finding 11-1 that TRC had proven its claims against Chevron.  The jury awarded $73,039,191 to compensate TRC for the harm caused by Chevron and found TRC was entitled to prejudgment interest.  The jury found 11-1 against Chevron on its counterclaims against TRC.

Chevron timely filed motions for JNOV and a new trial.  Chevron's motion for new trial was supported by declarations and a request for judicial notice of court documents in cases involving Juror No. 10.  TRC's opposition to the motion for new trial included declarations from nine jurors.

7

Following briefing and an October 20, 2021 hearing, the trial court filed a written ruling concluding the evidence adequately supported the jury's verdict as to both the amount of damages and causation and denying Chevron's motion for JNOV. The ruling also addressed Chevron's five grounds for a new trial. The court granted a new trial, finding Juror No. 10 had committed misconduct by failing to disclose his involvement in a prior civil court case and, most importantly, a felony sexual offense case from 1982. The court considered and rejected the alternate grounds for a new trial, determining sufficient evidence supported the jury's findings regarding causation and the amount of damages for the same reasons it denied the motion for JNOV. The court also determined Chevron's claims about instructional error and false testimony by TRC witnesses did not warrant a new trial.

The trial court's ruling also addressed TRC's motion for a determination of the amount of prejudgment interest. The ruling set forth an analysis of the evidence and legal issues and the court's agreement with TRC's calculation of prejudgment interest in the amount of $47,456,101. As instructed by the ruling, on October 26, 2021, the clerk of court entered judgment for just over $120 million. The ruling also stated: "After entry of the judgment, the court denies the Motion for JNOV, and grants the Motion for New Trial for the reasons herein stated." This unusual sequence was adopted because the trial judge was retiring.

In November 2021, TRC filed a motion to reconsider the grant of Chevron's motion for a new trial. The motion was supported by a declaration from a juror whose declaration had not been included in TRC's papers opposing Chevron's motion for a new trial. The court granted TRC's motion for reconsideration, considered TRC's new evidence, but ultimately affirmed its earlier ruling. TRC timely appealed, and Chevron filed a protective cross-appeal.

8

**DISCUSSION**

I.      THE MOTION FOR A NEW TRIAL WAS ERRONEOUSLY GRANTED

      *A.      Basic Legal Principles*

            *1.      Motions for New Trial*

A verdict may be vacated and a new trial granted for an "[i]rregularity in the proceedings of the court, jury or adverse party" that prevents any party from having a fair trial or for "[m]isconduct of the jury; and … such misconduct may be proved by the affidavit of any one of the jurors." (Code Civ. Proc., § 657, subds. 1, 2.)[6]  A new trial is authorized only if the irregularity or misconduct materially affected the substantial rights of the moving party (§ 657)—that is, it must be prejudicial.  One practice guide states that when a trial court is considering a new trial motion based on jury misconduct, it must undertake a three-step inquiry and decide (1) whether affidavits supporting the motion are admissible, (2) whether the evidence establishes misconduct occurred, and (3) whether the misconduct was prejudicial. (3 Fairbank, et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2023) ¶ 18:140.1, p. 18-39.)  The test for prejudice is whether there is a reasonable probability that a result more favorable to the moving party would have been obtained in the absence of the juror misconduct.  (*Bandana Trading Co., Inc. v. Quality Infusion Care, Inc.* (2008) 164 Cal.App.4th 1440, 1445; see *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570 [error is harmless if it is not reasonably probable moving party would have obtained a more favorable result in its absence]; *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417 (*Hasson*) *disapproved on other grounds by Soule v. General Motors Corp.* (1994) 8 Cal.4th 548 [in juror misconduct case, reasonable probability standard applied].)

---

[6]      Subsequent undesignated statutory references are to the Code of Civil Procedure.

9

## 2. *Standards of Review*

The proper standard or standards of review applicable to the trial court's order *granting* the motion for new trial based on juror misconduct is disputed by the parties. TRC contends orders granting a new trial generally are reviewed for an abuse of discretion but any trial court determination underlying such an order is reviewed under the standard or test appropriate for the type of issue resolved by that determination. In particular, TRC contends (1) findings resolving issues of fact are reviewed under the substantial evidence standard, (2) interpretations and applications of statutes and decisional law resolve issues of law and are reviewed under the de novo standard, and (3) the determination that prejudice arose from juror misconduct presents a mixed question of law and fact subject to independent review on appeal.

Chevron recognizes the general rule that the abuse of discretion standard applies to orders granting a new trial and contends an abuse occurs only if the grant is so irrational and arbitrary that no reasonable person could agree with it. Furthermore, Chevron contends that this traditional rule prevents the reviewing court from substituting its judgment for a trial court's determination that an error or irregularity was prejudicial, and that great deference is afforded orders granting new trials on the ground of juror misconduct. Chevron states "TRC is correct that certain statutory interpretation questions are subject to de novo review," but asserts "the new trial order can be affirmed based on the trial court's factual findings and exercise of discretion alone."

Initially, we note that the parties have cited *People v. Ault* (2004) 33 Cal.4th 1250 and *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 (*Aguilar*), which refer to the abuse of discretion standard. After *Ault* and *Aguilar* were issued, our Supreme Court provided the following clarification of the abuse of discretion standard of review:

> "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its

10

conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712 (*Haraguchi*); see *Vosburg v. County of Fresno* (2020) 54 Cal.App.5th 439, 460 (*Vosburg*); *County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 316 [abuse of discretion standard is not unified; a more specific rule might apply once the appellate court has identified the particular aspect of the trial court's determination being challenged].)[7]

In *Lee v. West Kern Water Dist.* (2016) 5 Cal.App.5th 606 (*Lee*), this court referred to *Aguilar* and *Ault* and concluded those cases established the principle that "when we apply the abuse of discretion standard in an appeal from an order granting a new trial, 'any determination underlying any order is scrutinized under the test appropriate for such determination.' " (*Lee*, *supra*, at p. 623, quoting *Aguilar*, *supra*, 25 Cal.4th at p. 859.) This principle is consistent with *Haraguchi,* and we conclude it applies in this appeal from the order granting Chevron a new trial.

The three standards of review identified in *Haraguchi* do not cover in detail the full variety of determinations made by a trial court. The first two standards—substantial evidence review of findings of fact and de novo review of questions of law—are commonly applied. For example, in *Vosburg*, this court recognized the abuse of discretion standard applied to decisions on motions for attorney fees under section 1021.5 and acknowledged that, under the description of an abuse of discretion set forth in *Haraguchi*, legal conclusions are reviewed de novo and findings of fact are reviewed for substantial evidence. (*Vosburg*, *supra*, 54 Cal.App.5th at p. 460.)

The third category of trial court determinations, which *Haraguchi* described as the "application of the law to the facts" (*Haraguchi*, *supra*, 43 Cal.4th at p. 712), can be

---

[7] The clarification provided in *Haraguchi* addressed without referencing Justice Wiener's criticism of the abuse of discretion standard as "so amorphous as to mean everything and nothing at the same time and [as] virtually useless as an analytic tool." (*Hurtado v. Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1022, disapproved on another ground in *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479, fn. 4.)

divided into recognized subcategories. In *Vosburg*, we stated that, in some circumstances, the application of the statute's criterion to the facts could present a mixed question of law and fact. (*Vosburg*, *supra*, 54 Cal.App.5th at p. 460.) We concluded that if factual questions predominate, a deferential standard of review applies and, alternatively, if the material facts are largely undisputed, the mixed question is treated as a question of law subject to de novo review. (*Ibid*.; see *Aguilar*, *supra*, 25 Cal.4th at pp. 860–861 [de novo review applies where the issue is purely or "predominately one of law"].) Our Supreme Court has explained how to differentiate between mixed questions of law and fact by stating:

> "Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied. If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.)

The last type of trial court determination that requires the application of the law to the facts involves a statute or rule of law that commits a particular issue to the court's discretion and requires the court to weigh various factors and choose from a range of possible outcomes. (*In re Marriage of Knox* (2022) 83 Cal.App.5th 15, 25; see *Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1089 [abuse of discretion standard measures whether act of lower tribunal falls within permissible range of options set by the legal criteria].) This standard does not apply in this appeal and, consequently, we need not describe it in detail.

To summarize, when a trial court grants a motion for new trial, we conclude the following standards of review apply to the various determinations made. Findings of fact and mixed questions of law and fact where factual questions predominate are reviewed

12

under the substantial evidence standard. The resolution of pure questions of law and mixed questions of law and fact that are predominantly legal are subject to de novo review. (*Aguilar, supra,* 25 Cal.4th at pp. 860–861; *Lee, supra,* 5 Cal.App.5th at p. 624 [de novo standard of review applied to determination of jury instructions' correctness].) Part I.E. of this opinion explains why the de novo standard of review applies to whether the juror misconduct was prejudicial.

### B. Trial Court's Determinations Relating to Juror Misconduct

#### 1. The Finding of Misconduct

The trial court determined jury misconduct occurred because Juror No. 10 (1) was statutorily ineligible to serve as a juror and (2) had deliberately concealed information in answering the juror questionnaire. These grounds are not completely separate because some undisclosed information related to his eligibility for jury service.

Concerning the first, the court found Juror No. 10 had previously been convicted of the crime of "indecent liberties" with a minor in Washington State in the 1980s and concluded he was required by California law to register as a sex offender when he moved here. The court also concluded he was ineligible to serve as a juror under Code of Civil Procedure section 203, which prohibits those required to register as a sex offender under Penal Code section 290 from serving as jurors.

Concerning the second, the court found Juror No. 10 had not disclosed this prior conviction on his questionnaire in response to the directive "If you have ever been to court for any reason (excluding divorce[)], please explain," and this failure to disclose information constituted misconduct. Addressing Juror No. 10's subjective state of mind, the trial court found he was of competent mind despite his age, he failed to answer the question honestly "to avoid embarrassment," any claim that he did not understand the question was a pretext, and he did not forget or inadvertently fail to disclose the information. The court noted: "No one forgets such serious charges."

13

The court also found Juror No. 10 had been a party to his spouse's personal injury suit, in which he pursued his own claim for loss of consortium, and he failed to honestly respond when he left a blank answer to the question asking, "[i]f you or anyone close to you has ever made a claim for money damages, explain." The trial court found the failure to disclose the truthful answers to the inquiries was willful and deliberate, and therefore constituted misconduct. As a result, the court proceeded to the question of whether the two instances of misconduct were prejudicial.

### 2. Trial Court's Prejudice Determination

The trial court's October 2021 ruling addressed prejudice by reiterating its findings that Juror No. 10's nondisclosures were deliberate and its disbelief of the assertion in his declaration that he did not understand the questions. The ruling included the court's findings that Juror No. 10 refused to follow the court's instructions; he played a large role in jury deliberations by being loud and opinionated; he intimidated another juror from freely discussing the conduct of TRC in causing damages; and he was otherwise ineligible. After setting forth these findings, the ruling stated: "Was he biased? The court is here confronted with an obstinate, untruthful, obstreperous, contemptuous, ineligible and entitled juror, refusing the orders of the court, who was loud, opinionated and intimidating in jury deliberations, and whose participation influenced the outcome." A footnote to this sentence stated: "The court cannot divorce the court's conclusion that the juror was ineligible from its evaluation [of prejudice]." The court then addressed TRC's arguments about the absence of juror bias and the inability to demonstrate prejudice in a civil case where the jury verdict was 11 to one. After rejecting those arguments, the court granted Chevron's motion for a new trial on the ground of prejudicial juror misconduct.

The trial court's reasoning was explained further in its December 2021 order on TRC's motion for reconsideration. The court stated the issue "presented is by what

14

standard does the court determine prejudice from juror misconduct in a civil case, when the misconduct is intentionally undisclosed facts rendering the juror ineligible and unqualified, when there is no actual misconduct during deliberations, and when there is a sufficient vote of at least nine qualified jurors in favor of the verdict." The court stated it was a close question and reasonable minds could differ on the impact of Juror No. 10's conduct. The court was convinced that his prominent participation in the jury deliberations was sufficient to infect the verdict and the integrity of the trial. As a result, the court confirmed its order granting a new trial. The court acknowledged the importance of the eligibility question to its conclusion by stating that "if this court is wrong that the revealed facts render the juror legally ineligible, then the motion for new trial should be denied."

### C. *Juror No. 10 Was Not Statutorily Ineligible to Serve as a Juror*

Our analysis of juror misconduct and prejudice begins with whether Juror No. 10 was ineligible to serve as a juror. This question involves the interpretation and application of Code of Civil Procedure section 203 and the Penal Code provisions governing the registration of sex offenders. There is no dispute about the underlying facts of Juror No. 10's prior conviction. As a result, the interpretation and application of section 203 presents a pure question of law subject to de novo review. (See *Aguilar*, *supra*, 25 Cal.4th at pp. 860–861; *Lee*, *supra*, 5 Cal.App.5th at p. 624.)

The court's mission in statutory interpretation is to give effect to the command of the Legislature and interpret the Legislature's intention in enacting the statute in the manner it did. (§ 1859 ["In the construction of a statute the intention of the Legislature … is to be pursued"]; *People v. Cruz* (1996) 13 Cal.4th 764, 782 ["[T]he fundamental goal of statutory interpretation is to ascertain and carry out the intent of the Legislature."]; *City of Chula Vista v. Drager* (2020) 49 Cal.App.5th 539, 560 [" ' " ' When we interpret the meaning of statutes, our fundamental task is to ascertain the

15

aim and goal of the lawmakers so as to effectuate the purpose of the statute.' " ' "].) The Legislature has noted our role in statutory construction is "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted." (§ 1858.) Accordingly, courts first look at the statute's words, giving them their usual, ordinary meaning because those words, having run the legislative gauntlet, are generally the most reliable indicator of legislative intent. (*Martinez v. City of Clovis* (2023) 90 Cal.App.5th 193, 239.)

When the statutory language, standing alone, is clear and unambiguous—that is, it has only one reasonable construction—courts *usually* adopt the plain or literal meaning of that language. (*Honchariw v. County of Stanislaus* (2013) 218 Cal.App.4th 1019, 1027.) The plain meaning rule is subject to exceptions. (*Ibid.*; *Switzer v. Wood* (2019) 35 Cal.App.5th 116, 129; see *Davis Boat Manufacturing-Nordic, Inc. v. Smith* (2023) 95 Cal.App.5th 660, 673 [where a party contends a latent ambiguity exists, a court may not simply adopt a literal construction and end its inquiry].) The exceptions apply when adopting the literal meaning of the statutory text "would (1) produce absurd consequences that the Legislature clearly did not intend or (2) frustrate the manifest purposes that appear from the provisions of the legislation when considered as a whole in light of its legislative history." (*Merced Irrigation Dist. v. Superior Court* (2017) 7 Cal.App.5th 916, 924; *Honchariw*, *supra*, at p. 1027; see also, *Arias v. Superior Court* (2009) 46 Cal.4th 969, 979 [nonliteral construction of Prop. 64 adopted based on evidence of underlying purpose and voter intent]; *Bob Jones University v. United States* (1983) 461 U.S. 574, 586 [a well-established canon of statutory construction provides that literal language should not defeat the plain purpose of the statute]; *Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 567 [plain meaning of constitutional provision rejected to avoid absurdity].)

16

Alternatively, when the statutory language is ambiguous, a court's primary goal is to adopt the interpretation that best effectuates the legislative intent or purpose. (*Martinez v. City of Clovis*, *supra*, 90 Cal.App.5th at p. 239.) "To identify a statute's purpose and the underlying legislative intent, courts may look to such aids as legislative history, the maxims of statutory construction, and the consequences of a particular interpretation, including its impact on public policy." (*Ibid*.)

### 1. The Juror Eligibility Statute

The language of the juror eligibility statute is relatively straightforward. California starts with the presumption that every person is eligible to serve as a juror. (§ 203, subd. (a).) The statute then sets out a list of exceptions, stating, as relevant to this case, "[a]ll persons are eligible and qualified to be prospective trial jurors, except … [p]ersons who are currently required to register as a sex offender pursuant to Section 290 of the Penal Code based on a felony conviction." (§ 203, subd. (a)(11).) Here, the parties dispute whether this provision should be interpreted as encompassing *only* those subject to registration pursuant to Penal Code section 290, which Juror No. 10 was not, or should be interpreted more expansively to include all those subject to a registration requirement pursuant to Penal Code sections 290 to 290.024. These Penal Code sections are known as the Sex Offender Registration Act and we consider them next.

### 2. Sex Offender Registration Requirements

Penal Code section 290 mandates that "[e]very person described in subdivision (c), for the period specified in subdivision (d) while residing in California, or while attending school or working in California," shall register with the local chief of police or sheriff, as well as the chief of police of any state university campus. (Pen. Code, § 290, subd. (b).) This registration shall occur within "five working days" of coming to or changing one's residence to California. (*Ibid.*) Thus, subdivision (b) creates a registration requirement under Penal Code section 290.

Subdivision (c) of Penal Code section 290 defines who must register as a sex offender amongst those convicted of crimes under California law. In relevant part, the provision states individuals convicted "in any court in this state or in any federal or military court" of one of a long list of crimes "shall register." (Pen. Code, § 290, subd. (c)(1).) The constituent crimes which result in required registration include the following: (1) "a violation of Section 187 committed in the perpetration, or an attempt to perpetrate, rape"; and (2) "any act punishable" under approximately 40 separately enumerated sections of the Penal Code, as well as "any statutory predecessor that includes all elements of one of the offenses described in this subdivision." (*Ibid*.) Also required to register is "any person who since that date has been or is hereafter convicted of the attempt or conspiracy to commit any of the offenses described in this subdivision." (*Ibid.*) Conspicuously absent from this list are those convicted of sexual offenses outside of California.

Penal Code section 290, subdivision (d) sets forth the amount of time for which a person identified in subdivision (c) must register, and is broken down into three tiers. Specifically, "[a] person described in subdivision (c), *or who is otherwise required to register pursuant to the Act* shall register for 10 years, 20 years, or life, following a conviction and release from incarceration, placement, commitment, or release on probation or other supervision, as follows." (Pen. Code, § 290, subd. (d), italics added.) The italicized language denotes that subdivision (d) sets forth the time requirements for registration, whether the registration requirement is imposed by Penal Code section 290 or another section. So-called "tier one offenders" are required to register for a minimum of 10 years. (*Id*., subd. (d)(1)(A).) "A person is a tier one offender if the person is required to register for conviction of a misdemeanor described in subdivision (c), or for conviction of a felony described in subdivision (c) that was not a serious or violent felony." (*Ibid*.) Tier two offenders are required to register for at least 20 years,

18

and are defined as those convicted of a limited number of enumerated offenses. (*Id.*, § 290, subd. (d)(2)(A).) Tier three offenders are required to register for life, and include those convicted of any number of a lengthy list of statutes. (*Id.*, § 290, subd. (d)(3)(A)–(R).)

Next, subdivision (d)(4) of Penal Code section 290 concerns how to categorize the registration requirement for a person who is required to register under a separate statute, Penal Code section 290.005, which addresses registration requirements for those convicted of sex-related crimes *outside* of California. Generally, "[a] person who is required to register pursuant to Section 290.005 shall be placed in the appropriate tier if the offense is assessed as equivalent to a California registerable offense described in subdivision (c)." (Pen. Code, § 290, subd. (d)(4)(A).) However, if there is no equivalent California offense, a person required to register under Penal Code section 290.005 "shall be subject to registration as a tier two offender," except in certain more severe cases, where the person can become subject to registration as a tier three offender. (Pen. Code, § 290, subd. (d)(4)(B).) Therefore, Penal Code section 290, subdivision (d) sets forth the time for which a registration requirement is imposed, whether by Penal Code section 290 or another section.

A number of succeeding statutes require registration of individuals not convicted of California crimes, such as those civilly committed as sexually violent predators (Pen. Code, § 290.001); those found not guilty by reason of insanity for registerable crimes (*id*., § 290.004); and most pertinent to this case, individuals convicted of certain crimes *outside* California (*id.*, § 290.005). Penal Code section 290.005, subdivision (a) requires any person "convicted in any other court, including any state, federal, or military court, of any offense that, if committed or attempted in this state … would have been punishable as one or more of the offenses described in subdivision (c) of Section 290" to register as a sex offender. Whether an out-of-state conviction would

19

have been punishable as a registrable California offense is based on either (1) "the elements of the convicted offense"; (2) "facts admitted by the person"; (3) "facts … found true by the trier of fact"; or (4) "stipulated facts in the record of military proceedings." (*Ibid*.) Also required to register are people ordered to do so by any other court, "if the court found at the time of conviction or sentencing that the person committed the offense as a result of sexual compulsion or for purposes of sexual gratification." (Pen. Code, § 290.005, subd. (b).) The statute also generally mandates that people register if they "would be required to register while residing in the state of conviction." (*Id.*, § 290.005, subd. (c).) However, there are a number of exceptions to this last requirement, and a person required to register in the state of conviction is *not* required to register in California for certain crimes, unless the out-of-state offense "contains all of the elements of a registerable California offense described in subdivision (c) of Section 290." (*Id.*, § 290.005, subd. (d).)

To summarize this lengthy statutory scheme, Penal Code section 290, subdivision (b) sets a registration requirement; Penal Code section 290, subdivision (c) defines the California statutes for which a conviction will require registration; and Penal Code section 290, subdivision (d) sets the amount of time for which registrants—regardless of which statute imposes the requirement—must register. Generally, registration is required for 10 years for those convicted of misdemeanors and certain felonies that are neither serious nor violent, 20 years for those convicted of a limited number of felonies, and life for those convicted of the majority of felonies. One may also be required to register in certain circumstances even if not convicted of the enumerated California crimes, and Penal Code section 290.005 requires people who were *not* convicted under California's Penal Code to register, if they were convicted of certain out-of-state crimes. Out-of-state crimes must be analyzed against California statutes to determine whether they would qualify, considering their elements and/or the facts admitted or established in the

20

proceeding. The length of time for which a person with an out-of-state conviction must register varies, but also relies upon a comparison with relevant California statutes and the crime of conviction, including its statutory elements and/or admitted or established facts.

### 3. *Application of Statutory Scheme to Juror No. 10*

With this statutory backdrop, we interpret the juror eligibility statute and apply that interpretation to the facts of this case. It is undisputed Juror No. 10 was not required to register as a sex offender pursuant to section 290 of the Penal Code. For purposes of this appeal only, we assume he was required to register as a sex offender pursuant to section 290.005 of the Penal Code. This assumption is based on his prior conviction for "indecent liberties" with a minor under Washington Revised Code, section 9A.44.100(1)(b) in 1982.

The trial court reviewed the Washington statute, as it existed at the time of conviction, which essentially criminalized "sexual contact with a minor for sexual gratification." Juror No. 10 pleaded guilty, and in doing so admitted he had "sexual contact" with a minor in December 1981 or January 1982. A clinical psychologist's report reflected Juror No. 10 had self-reported "that the abuse occurred approximately once a week for four months." The Washington court sentenced Juror No. 10 to a 10-year deferred sentence, 90 days in jail, and outpatient therapy. No registration was then required because Washington did not enact mandatory sex offender registration until 1990. Juror No. 10 was released from probation after five years upon a psychologist's recommendation, and the Washington court allowed him to withdraw the finding of "guilty" and enter a plea of "not guilty," and thereafter dismissed the case, in March 1987.

The trial court concluded Juror No. 10, who had apparently not registered as a sex offender within California, was required to register pursuant to Penal Code

21

section 290.005.**8** The trial court reviewed the statutory elements of Washington Revised Code, section 9A.44.100(1)(b), compared them to the 1982 version of Penal Code section 288, considered the factual bases Juror No. 10 acknowledged in the psychologist's report, and concluded Juror No. 10 would have violated Penal Code section 288, had the crime occurred in California. Conviction under Penal Code section 288 would have required registration as a sex offender under Penal Code section 290. Accordingly, the court concluded Juror No. 10 was required to register as a sex offender pursuant to Penal Code section 290.005.

The trial court referred to Penal Code section 290, subdivision (a), which states in full: "Sections 290 to 290.024, inclusive, shall be known, and may be cited, as the Sex Offender Registration Act. All references to 'the Act' in those sections are to the Sex Offender Registration Act." The court then stated: "Penal Code section 290.005 provides that persons convicted of qualifying crimes out-of-state 'shall register in accordance with the Act.' Section 203 ineligibility includes persons registrable under section 290.005." Thus, the court interpreted the ineligibility provision of section 203, subdivision (a)(11) to apply to anyone who must register under the Sex Offender Registration Act. In short, the court adopted a nonliteral interpretation of section 203 by

---

**8** The parties do not dispute this determination. Rather than deciding the question, we assume for purposes of this appeal that registration was required, but note the trial court's determination is not indisputable. Juror No. 10 received a deferred sentence and, after completion of a term of probation, was allowed to change his plea to "not guilty," after which the case was dismissed. It could be argued this is not equivalent to Juror No. 10 being "convicted" within the meaning of Penal Code section 290.005. Because the collateral consequences of being required to register as a sex offender are significant, and Juror No. 10 is not a party to this proceeding, we express no opinion as to whether Juror No. 10 *is* required to register under Penal Code section 290.005. Any purported decision on that point would not be binding on Juror No. 10 in a subsequent proceeding, given the due process concerns implicated by his absence here.

substituting the entire Sex Offender Registration Act for the Legislature's reference to Penal Code section 290.

Section 203, the juror eligibility statute, requires three elements for a person to be ineligible to serve as a juror based on a sex offender registration: a person must (1) "currently" be; (2) "required to register as a sex offender pursuant to Section 290 of the Penal Code"; (3) "based on a felony conviction." (§ 203, subd. (a)(11).) The use of "currently" means the ineligibility provision does not reach a person previously required to register as a sex offender pursuant to Penal Code section 290, but no longer required to do so. The phrase "based on a felony conviction" means the provision does not disqualify from service a person required to register under Penal Code section 290 due to a misdemeanor conviction. Thus, a portion of the persons clearly required to register by Penal Code section 290—certain persons convicted of misdemeanors—are not ineligible to serve as jurors. (See Pen. Code, § 290, subd. (d)(1)(A) [noting those convicted of eligible misdemeanors are required to register for 10 years].) Lastly, the language refers only to persons required to register as a sex offender under Penal Code section 290. This wording does not reach persons required to register under other Penal Code sections.

Contrary to the plain language of section 203, the trial court equated felons required to register under Penal Code section 290 with felons required to register under the Sex Offender Registration Act. Section 203—whether in subdivision (a)(11) or elsewhere—does not reference the "Sex Offender Registration Act" generally, or "[Penal Code] sections 290 to 290.024" more particularly. Instead, it only references those required to register pursuant to section 290 of the Penal Code.

Besides the literal or plain meaning of "section 290 of the Penal Code" (§ 203, subd. (a)(11)), other linguistic and structural references within section 203 support the conclusion that juror ineligibility does not extend to those required to register under other provisions. The Legislature, in drafting section 203, clearly knew how to refer to a wider

23

group of statutory provisions when it wished to do so.  Section 203 specifies that those ineligible for jury service include "[p]ersons who are not domiciliaries of the State of California, as determined pursuant to Article 2 (commencing with Section 2020) of Chapter 1 of Division 2 of the Elections Code."  (§ 203, subd. (a)(3).)  By this reference, the Legislature clearly intended for an interpreting court to refer to the entire article, starting with a particular code section, of a specific chapter in a specific division of the Elections Code.  By way of comparison, section 203, subdivision (a)(11) *does not* make ineligible those required to register pursuant to chapter 5.5 of title 9 of part 1 of the Penal Code.  The fact that, in another provision of the very same statute, the Legislature invoked a wider range of statutory provisions by reference to chapter and division indicates the Legislature was well aware of how to craft its language more broadly, if it chose to do so.  This suggests the decision *not* to do so in section 203, subdivision (a)(11) was intentional.

Chevron asserts "the requirement to register under section 290.005 is incorporated into section 290."  However, Chevron merely points to the introductory language of section 290, subdivision (a), stating that "Sections 290 to 290.024, inclusive, shall be known, and may be cited, as the Sex Offender Registration Act.  All references to 'the Act' in those sections are to the Sex Offender Registration Act."[9]  (Pen. Code, § 290, subd. (a).)  This is irrelevant because section 203 contains no references to "the Sex Offender Registration Act."  Subdivision (a)(11) refers to "Section 290 of the Penal Code."  Were the language of section 203 drafted differently, our analysis would

---

[9] To the extent Chevron relies on the language of subdivision (d) of Penal Code section 290, which states a person "shall register for 10 years, 20 years, or life," depending on certain circumstances, this is not itself a registration requirement, but rather merely a timing provision, as discussed above.  The registration requirements are set by subdivision (b), and by additional code sections found at Penal Code section 290.001 et seq.

24

correspondingly change. But we are not free to rewrite the statute or create new categories of juror ineligibility the Legislature has not seen fit to create. (See § 1858.)

Well established principles of statutory interpretation also support our reading of section 203. The canon of statutory interpretation known as *expressio unius est exclusio alterius*, i.e., the express mention of one thing excludes all others, supports this interpretation of the statute. "Under the maxim of statutory construction, *expressio unius est exclusio alterius*, if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary." (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1230; *Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 410.) More recently, our Supreme Court has explained in some detail when the inference permitted by this maxim arises: "when there is some reason to conclude an omission is the product of intentional design." (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 514.) "The text must contain a specific list or facially comprehensive treatment," because the inference arises only because the Legislature is presumed not to leave out key terms from a comprehensive list. (*Id.* at 514–515.)

This is precisely the circumstance we face here. Section 203 states "[a]ll persons are eligible and qualified to be prospective trial jurors." (§ 203, subd. (a).) It then provides a specific list of exemptions—that is, a list of people who are *not* eligible to be trial jurors. It closes this list by specifically noting, "[N]o person shall be excluded from eligibility for jury service in the State of California, for any reason other than those reasons provided by this section." (§ 203, subd. (b).) This is the type of comprehensive list from which we can and should imply an omission has significance. The Legislature has omitted any other registration requirement under the Sex Offender Registration Act from juror ineligibility, except for those "currently" required to register under Penal Code

25

section 290 "based on a felony conviction." (§ 203, subd. (a)(11).)  These specific requirements imply the Legislature intended to exclude others not expressly listed.

We recognize that our Supreme Court had cautioned that the maxim about exclusionary lists cannot be applied inflexibly, particularly "if its operation would contradict a discernible and contrary legislative intent," or "if doing so would result in absurd consequences that the Legislature could not have intended" (*In re J.W.* (2002) 29 Cal.4th 200, 209–210; *Estate of Banerjee* (1978) 21 Cal.3d 527, 539 ["*expressio unius est exclusio alterius* is no magical incantation, nor does it refer to an immutable rule"].)  However, having considered Chevron's arguments to the contrary, we conclude this maxim is appropriate here.

First, Chevron has not identified a discernible and contrary legislative intent.  Chevron argues that inferences about legislative intent should be drawn from a broad reference in legislative materials to permitting some felons to serve on juries if they are " 'not required to register as a sex offender because of a felony conviction.' "  We will not infer a specific legislative intent from this general reference because the inference is weaker than those inferences drawn from the express language of section 203 itself— language that is the more reliable indicator of intent.

Second, we consider Chevron's argument that the plain meaning of section 203 produces absurd consequences.  We previously have recognized that the absurdity exception should be used sparingly and only in extreme cases to avoid a judicial infringement of the Legislature's separate power.  (*Switzer v. Wood*, *supra*, 35 Cal.App.5th at p. 129.)  Here, Chevron argues a literal interpretation would result in absurd consequences because it would bar someone convicted of a sex offense in this state from jury service while allowing someone convicted of a similar sex offense in another state to serve on a jury.

26

We conclude this apparent inconsistent treatment of sex offenders does not create absurd consequences that justify rewriting section 203 to expand ineligibility. Instead, this is a situation where the practical needs of the trial management process justify bright lines that are easy to administer at the expense of more nuanced and precise results. As TRC notes, the process of deciding a person who committed an offense in another state is required to register as a sex offender in this state is hardly straightforward. Penal Code section 290.005 mandates any person "convicted in any other court, including any state, federal, or military court, of any offense that, if committed or attempted in this state, based on *the elements of the convicted offense or facts admitted by the person or found true by the trier of fact or stipulated facts* in the record of military proceedings, *would have been punishable* as one or more of the offenses described in subdivision (c) of Section 290" is required to register as a sex offender. (Pen. Code, § 290.005, subd. (a) [italics added].) This then requires, at a minimum, a comparison of prior versions of criminal statutes in the state of conviction with prior versions of those in California, to see whether their elements are the same. If they are not the same—which is likely to be the case in the majority of instances, given the number of iterations of different criminal statutes that exist outside of California[10]—a court must then review any facts admitted in a guilty plea or found true by the trier of fact, and determine whether those facts would have been punishable under a registrable statute in California at the time of the offense. This could involve procuring and reviewing thousands of pages of transcripts of witness testimony and other exhibits, to determine what facts the trier of fact necessarily found in order to convict the accused. Only then would a court and/or its juror services

---

**10**     It bears noting this does not apply solely to convictions from American courts, but also presumably includes convictions in the courts of other countries. (See Pen. Code, § 290.005, subd. (a) [noting the section applies to "any person who, since July 1, 1944, has been, or is hereafter convicted in *any other court*" (italics added)].)

department be able to say a person convicted of an out-of-state offense was required to register under California's Sex Offender Registration Act.

Consequently, it was reasonable for the Legislature to choose clear boundaries and not require courts or jury commissioners to undertake such a labor to seat a jury panel for possible selection. The above-described inquiry would be onerous and time consuming. If the analysis was conducted by the jury commissioner under her authority to use juror questionnaires (see § 205), any resulting exclusion would be virtually immunized from review by any higher court, since it would be conducted ancillary to and outside of any particular litigation. If the analysis was conducted by the court during voir dire, such a proceeding could quickly become a "trial-within-a-trial" that might require the court to stop jury selection to review thousands of pages of documents to determine whether a prospective juror should be required to register under the Act and, thus, ineligible to serve as a juror. This would be impractical from a trial management perspective. Accordingly, we conclude it was reasonable for the Legislature to avoid this impracticality by making *only* those convicted of California crimes ineligible de jure, and leaving the parties to use one of their peremptory challenges to remove any further unfavored jurors. (See §§ 225, subd. (b)(2), 226, 231, subd. (c).)

In sum, the Legislature has recognized that California's sex offenses may differ from those of other jurisdictions and has addressed that possibility by adopting a registration statute requiring an involved analysis of a conviction in another jurisdiction to determine whether it constitutes a registrable offense. (See Pen. Code, § 290.005, subd. (a).) It was reasonable for the Legislature to impose this analysis for purposes of registration. Furthermore, based on the way it dealt with the problem at the registration level, it was reasonable for the Legislature to exclude registrable out-of-state convictions from the juror ineligibility provision in section 203, subdivision (a)(11) because of the

28

practical difficulties in performing the analysis used for registration during the jury selection process.

Chevron argued at oral argument that *In re E.J.* (2010) 47 Cal.4th 1258 resolves this question, because the Supreme Court therein treated a person required to register under Penal Code section 290.005 as falling within somewhat similar statutory language only facially referencing Penal Code section 290. However, *E.J.* does nothing to resolve the present issue and says nothing about whether, as a matter of statutory interpretation, Penal Code section 290.005 falls within the ineligibility specified by section 203. That case concerned a housing restriction on registered sex offenders, which stated, "it is unlawful for any person for whom registration is required pursuant to Section 290 to reside within 2000 feet of any public or private school, or park where children regularly gather." (Pen. Code, § 3003.5, subd. (b).) The Supreme Court in *E.J.* addressed ex post facto arguments about this recently enacted law, but declined to address additional constitutional challenges related to overbreadth, vagueness, and violations of privacy rights, property rights, travel rights, and due process due to the need for further factfinding. (*E.J., supra*, at pp. 1264–1265.) While it is true one of the four petitioners in *E.J.* was apparently required to register under Penal Code section 290.005, the opinion contained no discussion as to whether the statutory language of section 3003.5 also applied to such registrants, as the issue was not raised by any party. It is axiomatic prior opinions only have precedential value for issues actually considered and resolved. (*People v. Knoller* (2007) 41 Cal.4th 139, 154–155; *Areso v. CarMax, Inc.* (2011) 195

Cal.App.4th 996, 1005–1006.)  Thus, *E.J.* is not relevant authority for how to interpret section 203.[11]

In sum, we conclude section 203 means what it says.  Those currently required to register under Penal Code section 290 based on a felony conviction are ineligible to serve as jurors.  Those required to register as sex offenders under any other statutory provision are not made ineligible by section 203.  We adopt section 203's plain meaning because Chevron has not demonstrated it produces absurd consequences or would frustrate the manifest purposes of the juror eligibility statute.  Therefore, Juror No. 10 was not ineligible to serve as a juror even when we assume he was required to register under Penal Code section 290.005.  The trial court's ineligibility determination was wrong as a matter of law.

### D.    *The Concealment of Information Constituted Juror Misconduct*

Our conclusion that Juror No. 10 was eligible to serve as a juror does not end the inquiry into juror misconduct.  The trial court also found Juror No. 10 intentionally

---

**11**    Further, even if we did believe the Supreme Court intended to interpret Penal Code section 3003.5, subdivision (b) to include reference to both Penal Code sections 290 and 290.005, even though only Penal Code section 290 is referenced in the text, it still would not control the outcome to this case.  The two statutes—Code of Civil Procedure section 203 and Penal Code section 3003.5—use different language.  Section 3003.5 refers to "any person for whom registration is required pursuant to Section 290." Code of Civil Procedure section 203, subdivision (a)(11), meanwhile, refers to "[p]ersons who are currently required to register as a sex offender pursuant to Section 290 of the Penal Code based on a felony conviction." (Code Civ. Proc., § 203, subd. (a)(11).)  The language of Section 203 is considerably more qualified, excluding those no longer subject to registration and those required to register for a misdemeanor. We cannot assume the Supreme Court's analysis of these two statutes would be analogous.  Nor are other policy concerns as readily applicable.  The need for practical bright lines is obvious when it comes to determining potentially qualified jurors, and our justice system retains mechanisms to exclude undesired jurors through the use of peremptory strikes and for-cause challenges.  It is less obvious the same need for a bright line is present in section 3003.5, nor is there another readily apparent legal backstop analogous to peremptory strikes and for-cause challenges.

30

concealed information in responding to the juror questionnaire. Specifically, the court found Juror No. 10 failed to truthfully respond to the inquiry, "If you have ever been to court for any reason (excluding divorce), please explain," stating only "Traffic Court Found Not Guilty." This answer did not disclose his prior Washington crime or his being a party to a personal injury suit.

TRC does not argue the trial court erred in finding misconduct based on these two omissions. Unlike the question of Juror No. 10's statutory eligibility, whether the specific answers given by Juror No. 10 in this case were untruthful is primarily a factual question subject to review under the substantial evidence standard. The record contains sufficient evidence of Juror No. 10's involvement in other court cases to uphold the finding that information was omitted.

Further, the trial court's disbelief of the assertion in Juror No. 10's posttrial declaration that the omissions were inadvertent also withstands scrutiny on appeal. When a trial court finds all or part of a person's testimony is not credible, appellate courts apply the following rule: "A trier of fact is free to disbelieve a witness, even one uncontradicted, if there is any rational ground for doing so." (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043.) The trial court clearly identified a rational ground for disbelieving Juror No. 10's declaration—he wished to avoid embarrassment. (See Evid. Code, § 780, subd. (f) [trier of fact, in determining truthfulness of a witness, may consider his or her "interest, or other motive"].) Accordingly, the finding that Juror No. 10 intended to withhold known information has adequate evidentiary support.

Consequently, the trial court's determination that Juror No. 10 engaged in juror misconduct withstands scrutiny on appeal because it is supported by substantial evidence and it is consistent with the law defining juror misconduct. (See *In re Hitchings* (1993) 6 Cal.4th 97, 111 [juror who conceals relevant facts during voir dire undermines the jury selection process and commits misconduct].)

31

E. *De Novo Review of Prejudice Is Required*

Having decided the trial court correctly determined Juror No. 10's failure to disclose information constituted misconduct, we address whether this misconduct was prejudicial. We note the trial court stated: "The court cannot divorce the court's conclusion that the juror was ineligible from its evaluation [of prejudice]. If the court is incorrect in its conclusion, the court understands that a reviewing court will consider the other issues *de novo*." Also, the court's order on reconsideration noted that "if this court is wrong that the revealed facts render the juror legally ineligible, then the motion for new trial should be denied." These statements establish that the trial court's prejudice determination was explicitly predicated on its incorrect ruling that Juror No. 10 was ineligible.

This legal error in the trial court's evaluation of prejudice raises the question whether the issue should be remanded to the trial court for redetermination based on a correct understanding of the law. This is normally the preferred course, because the question remaining here is whether the juror's misconduct in being untruthful on the questionnaire was prejudicial to Chevron, and this is a question the trial court is generally best situated to answer, having observed the entire case and not acting solely from a cold record. (*In re Mesner's Estate* (1947) 77 Cal.App.2d 667, 677 ["[T]he atmosphere of the court room during the trial … is something that cannot be adequately reflected in a printed record."].) Indeed, some courts have concluded this is the appropriate course of action. (See *Barrese v. Murray* (2011) 198 Cal.App.4th 494, 505–508.) However, we interpret existing case law as foreclosing this option under the circumstances before us.

Section 660 states: "Except as otherwise provided in Section 12a of this code, the power of the court to rule on a motion for a new trial shall expire 75 days after the mailing of notice of entry of judgment by the clerk of the court pursuant to Section 664.5 or 75 days after service on the moving party by any party of written notice of entry of

32

judgment, whichever is earlier, or if that notice has not been given, 75 days after the filing of the first notice of intention to move for a new trial." (§ 660, subd. (c).) A number of courts have held this time limit is mandatory and jurisdictional, and prevents motions for a new trial from being remanded to the trial court for reconsideration. (*Maroney v. Iacobsohn* (2015) 237 Cal.App.4th 473, 485–486, fn. 11 [cannot remand for reconsideration]; *Delos v. Farmers Group, Inc.* (1979) 93 Cal.App.3d 642, 667–668 [concluding a motion for a new trial cannot be remanded to trial court because section 660 is jurisdictional, unless a judicially-created exception applies]; *Clemens v. Regents of University of California* (1971) 20 Cal.App.3d 356, 360–363 (*Clemens II*) [Court of Appeal should review issue de novo, rather than remand on issue of prejudice]; *Lippold v. Hart* (1969) 274 Cal.App.2d 24, 26–27 [cannot revive jurisdiction through a remand for reconsideration].)

Based on our review of the case law, we find *Mercer v. Perez* (1968) 68 Cal.2d 104 (*Mercer*) controls. In *Mercer*, the Supreme Court considered a related statute—section 657—which had, at the time, been recently revised to require the trial court to specify the grounds for a new trial and, if the basis was insufficiency of the evidence, to explain its reasons for concluding the evidence was insufficient. (*Mercer*, *supra*, at pp. 111–115.) In *Mercer*, the trial court identified the grounds for a new trial as insufficiency of the evidence, but failed to specify the reasons the evidence was insufficient. (*Id.* at pp. 115–118.) Noting failure to so specify was error as a matter of law, the Supreme Court was faced with the question of whether it could send the matter back to the trial court to simply specify the reasons it had omitted. (*Id.* at pp. 119–122.) The Supreme Court concluded it could not do so, because the statute contained a strict time limit, and doing so would permit the trial court to act outside of the jurisdiction granted by statute. (*Id.* at pp. 121–122.)

33

In reaching this conclusion, the Supreme Court found a "persuasive analogy" between the statute in question in *Mercer*—section 657—and section 660. (*Mercer, supra,* 68 Cal.2d at p. 123.) It cited with approval a case concluding "[t]he time limits of section 660 are mandatory and jurisdictional, and an order made after the 60-day period purporting to rule on a motion for new trial is in excess of the court's jurisdiction and void." (*Ibid.,* quoting *Siegal v. Superior Court* (1968) 68 Cal.2d 97, 101 (*Siegal*).) The Supreme Court further cited approvingly a decision where a trial court had not acted within the 60-day period and the Court of Appeal concluded the trial court lost jurisdiction once that period expired. (*Ibid.*, citing *Free v. Furr* (1956) 140 Cal.App.2d 378.) As a result, the Court of Appeal refused a remand to the trial court. We thus take from *Mercer* that section 660 is indeed meant to be jurisdictional, and once the time limit set forth there has expired, the matter may not be revisited by the trial court. The Supreme Court has continued to uphold this view and reinforced its holding that section 657 (and by analogy, section 660) was jurisdictional as recently as 2007. (See *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 634–635.)

*Siegal*, cited by *Mercer*, concerned a writ taken after a trial court granted a motion for new trial, but failed to enter the minute order doing so within the statutory time period. (*Siegal, supra,* 68 Cal.2d at pp. 99–100.) The trial court entered a minute order after the statutory period, and did so *nunc pro tunc*, with a directive that the order be deemed to have been issued on the date it should have been issued. (*Id.* at p. 99.) The Supreme Court concluded section 660 was "mandatory and jurisdictional," and therefore the *nunc pro tunc* order was issued without jurisdiction, because "[i]t is not the function of a *nunc pro tunc* order 'to make an order now for then, but to enter now for then an order previously made.' " (*Siegal, supra,* at p. 101.) While *Siegal* standing alone would, perhaps, be distinguishable from a case on regular appeal, *Mercer* decides that issue. The

34

Court in *Mercer* considered whether, in light of error, a new trial motion could be remanded for further findings after appeal and determined it could not.

There appears to be a split on this issue in published cases. The contrary view is set forth most expressly in *Barrese v. Murray, supra,* 198 Cal.App.4th 494, in which the Second District of the Court of Appeal found the statute was not intended to be jurisdictional and did not contemplate situations where the matter was taken on appeal and reviewed, concluding it only mandated a time limit within which the trial court must rule in the first instance. (*Id.* at pp. 505–508.) The court stated, "section 660 was not intended to operate, or apply, in settings where, following an appeal from the judgment, the appellate court remands the case with directions to the trial court to conduct further proceedings on a motion for new trial." (*Id.* at p. 508.) The court based this inference about legislative intent in part on its belief that a remand following appeal was a different context than the one it believed was envisioned by the Legislature in enacting section 660. (*Barrese, supra,* at pp. 506–507.) It also pointed to three Supreme Court cases in which the Court set aside new trial motions and remanded with directions to the trial court to rehear the motions: *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798; *Krouse v. Graham* (1977) 19 Cal.3d 59; and *People v. Robarge* (1953) 41 Cal.2d 628. (*Barrese, supra,* at p. 507.) However, none of these cases cite *Mercer* or *Siegal*, much less overrule them. We do not believe the Supreme Court intended to overrule express holdings of *Mercer* and *Siegal sub silentio*, particularly since the belief in the Court of Appeal's inability to remand in this situation was again reiterated in *Oakland Raiders v. National Football League, supra,* 41 Cal.4th 624.

The Courts of Appeal have been inconsistent on this issue. Even cases that heavily rely on *Barrese* have generally decided on their own how the motion for new trial *should* have been resolved after finding the trial court erred. (See *Ryan v. Crown Castle NG Networks, Inc.* (2016) 6 Cal.App.5th 775, 783–787 [concluding the trial court erred

35

by failing to understand its duty to provide substantive review of the sufficiency of the evidence to uphold the jury's verdict]; *id.* at pp. 787–790 [concluding independently, without remand to the trial court, that the motion for new trial should have been granted].) And there are instances in which the Court of Appeal has approached this same question in two different ways. In *Clemens v. Regents of University of California* (1970) 8 Cal.App.3d 1 (*Clemens I*), the appellate court remanded to the trial court to reconsider the motion for new trial pursuant to the then-recent opinion in *People v. Hutchinson* (1969) 71 Cal.2d 342. (*Clemens I*, *supra*, at p. 19.) In doing so, the court noted "the facts are by no means conclusive that a new trial should be granted," but found "the trial court might have reached a different result if *Hutchinson* had been decided prior to the critical hearing." (*Ibid.*) Following remand, the trial court denied the motion for new trial, which was then appealed in *Clemens II, supra,* 20 Cal.App.3d 356. In *Clemens II*, the Court of Appeal found the trial court erred in its determination of the applicable standard. (*Id.* at pp. 360–361.) However, it then concluded that, jurisdictionally, section 660 prevented remand to the trial court. (*Clemens II, supra,* at pp. 361–362.) The appellate court accordingly reviewed the evidence de novo in determining a new trial should have been granted. (*Clemens II, supra,* at pp. 362–367.)

We conclude the weight of authority discussed above establishes that remand is not an available option. We therefore decline to follow *Barrese*. Because we cannot remand this case to the trial court to consider whether Juror No. 10's misconduct was sufficient to grant a new trial—understanding he was not statutorily ineligible to serve— we proceed to make the prejudice determination ourselves.[12]

---

[12] Our de novo evaluation of prejudice affords no deference to the trial court's commentary that "if this court is wrong that the revealed facts render the juror legally ineligible, then the motion for new trial should be denied."

36

*F. Juror No. 10's Misconduct Was Not Prejudicial*

We begin our de novo review of the prejudice question by acknowledging the principle that a finding of misconduct creates a presumption of prejudice. (*In re Boyette* (2013) 56 Cal.4th 866, 889; *In re Hitchings, supra,* 6 Cal.4th at p. 118; *People v. Cooper* (1991) 53 Cal.3d 771, 835; *In re Stankewitz* (1985) 40 Cal.3d 391, 399.) This presumption applies equally to civil and criminal cases. (*Hasson, supra,* 32 Cal.3d at pp. 416–417 ["[R]egardless of the rule's origin, civil litigants, like criminal defendants, have a constitutionally protected right to the complete consideration of their case by an impartial panel of jurors. … No principled distinction can be drawn between civil and criminal cases for purposes of the presumption of prejudice arising from juror misconduct."].)

The Supreme Court has explained, "[t]he presumption of prejudice is an evidentiary aid to those parties who are able to establish serious misconduct *of a type likely to have had an effect on the verdict* or which *deprived the complaining party of thorough consideration of his case*, yet who are unable to establish by a preponderance of the evidence that actual prejudice occurred. The law thus recognizes the substantial barrier to proof of prejudice which Evidence Code section 1150 [which bars evidence showing what effects misconduct had on a juror's decision to vote] erects, and it seeks to lower that barrier somewhat." (*Hasson*, *supra*, 32 Cal.3d at p. 416, italics added.)

The presumption that juror misconduct is prejudicial is not conclusive. (See Evid. Code, § 601 [presumptions are "either conclusive or rebuttable"].) It can be rebutted by two routes, by *either* "an affirmative evidentiary showing that prejudice does not exist *or* by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Hasson*, *supra*, 32 Cal.3d at p. 417, italics added.) Here, we are required

to re-examine the entire record de novo regardless because the trial court tied its determination of prejudice specifically and inextricably to an aspect of the juror's misconduct about which it was legally mistaken. Thus, we look to whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct.

The verdict will not be disturbed "if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*In re Boyette, supra,* 56 Cal.4th at p. 890.) The test is whether the juror's conduct or failure to disclose evidences or shows bias. (*Ibid.*) "The standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life.' " (*In re Hamilton* (1999) 20 Cal.4th 273, 296.) Because the jury is a "fundamentally human" institution, it cannot be divorced from the fact that jurors will have different experiences, opinions, and personalities, which is both a strength and a weakness of having civilian juries. (*People v. Marshall* (1990) 50 Cal.3d 907, 950.) "If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias." (*In re Carpenter* (1995) 9 Cal.4th 634, 655.)

As several appellate court opinions have commented recently, "[t]he law concerning prejudice lacks clarity." (*People v. Solorio* (2017) 17 Cal.App.5th 398, 407.) "Whereas some cases focus on whether the presumption of prejudice arising from misconduct has been successfully *rebutted*, others consider whether the prejudice was sufficiently *substantial* to warrant reversal. [Citations.]" (*Ibid.*) However, our Supreme Court has expressed these standards as two sides of the same coin, noting: "Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice,

38

i.e., no substantial likelihood that one or more jurors were actually biased against the defendant." (*In re Hamilton, supra,* 20 Cal.4th at p. 296; see also *In re Boyette, supra,* 56 Cal.4th at p. 890.) In other words, if this court determines there was no substantial likelihood one or more jurors were actually biased against Chevron, the presumption will, of necessity, have been rebutted.

"Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (*Hasson*, *supra*, 32 Cal.3d at p. 417.) This list is not exhaustive, nor is it a set of elements that must be met to determine whether misconduct was prejudicial. All told, we must determine whether there was a substantial likelihood of actual bias, which would create a reasonable probability of actual harm to the complaining party.

"Society has a manifest interest in avoiding needless retrials: they cause hardship to the litigants, delay the administration of justice, and result in social and economic waste." (*Mercer, supra,* 68 Cal.2d at p. 113.) Our Supreme Court has clearly noted it will not "allow the impeachment of jury verdicts on a bare showing that some jurors failed to conform their conduct to the ideal standard of utmost diligence in the performance of their duties." (*Hasson, supra*, 32 Cal.3d at p. 418.) The Court has commented that even conduct that cannot generally be condoned may still not warrant retrial, especially in long or complex cases, because doing so would be unworkable and would allow the perfect to become the enemy of the just. (*Ibid.* ["Retrials are to be avoided unless necessitated by a more substantial dereliction of jurors' duties than was evident in this case."].)

### 1.     *Jury Selection and Trial*

We think it appropriate to note, if only for context, the circumstances of this case that highlight the burdens of granting new trials.

39

It is clear from the record in this case that seating a jury was a difficult process. This is unsurprising, given that trial was projected to last six weeks, and occurred in the immediate aftermath of the COVID-19 pandemic. Voir dire began on July 19, 2021, and lasted through August 2. Almost 200 prospective jurors were excused for cause during this process. Given the difficulty of the process and the length of the anticipated trial, while the court initially anticipated seating only four alternates, it ultimately expanded this to six alternates.

This proved to be a prescient move on the part of the trial court, because numerous jurors were excused throughout the trial. On August 30, 2021, after almost four weeks of trial, one juror developed COVID. Following rules set by California's Division of Occupational Safety and Health, the court ultimately excused three jurors, including both the ill juror and two who had been in contact with them. At that point, the court also took other appropriate measures to ensure no mistrial would occur, including closing the court, limiting the number of attorneys permitted to be physically present in the courtroom, requiring jurors and others to mask much of the time, and setting all other law and motion hearings to remote appearances only. Then on September 9, 2021, at the end of the sixth week of trial, the court excused another juror who needed to take care of their spouse following a surgical procedure. By September 17, after seven weeks of trial and a full week past the expected completion date projected by the parties, the court noted the case was "at serious risk of a mistrial," because it had only one alternate remaining, indicating a fifth juror was excused at some point in the proceeding. The court expressed its concerns with what would happen if a mistrial occurred, observing that the case was seven years old and "if it's mistried, it probably won't see the light of day for another two or three years."

These practical difficulties do not control our analysis of whether prejudice occurred. However, we do find them instructive to clearly articulate the burden that is

placed on the judicial system when a losing party seeks a new trial because of alleged juror misconduct.

## 2. *Nature and seriousness of the misconduct.*

We next turn to the nature and seriousness of the misconduct. In this case, the misconduct that occurred was Juror No. 10's intentional untruthfulness during voir dire about any prior involvement in court cases. In appropriate instances, a juror's intentional dishonesty during voir dire can be circumstantial evidence of their bias against a particular party. "[W]hen a juror conceals material information on voir dire, 'that information establish[es] substantial grounds for inferring that [the juror] was biased ... despite ... protestations to the contrary.' " (*In re Hitchings, supra,* 6 Cal.4th at p. 120, quoting *People v. Price* (1991) 1 Cal.4th 324, 400–401.) A juror's "false answers" during voir dire can therefore provide "an initial indication that she may have prejudged [the] case." (*Hitchings, supra,* at p. 120; see also *McDonough Power Equip., Inc. v. Greenwood* (1984) 464 U.S. 548, 556 (conc. opn of Blackmun, J.) ["[T]he honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial"].)

The trial court found Juror No. 10 was not biased against Chevron when it noted he concealed his prior conviction solely out of embarrassment. The court noted this elsewhere as well, stating on the record: "Well, he wasn't biased. I didn't find that he was biased for or against TRC or Chevron." Nor does Chevron point us to any evidence suggesting Juror No. 10 was biased against it, or biased in some other manner that would have affected his or other jurors' analyses of the substantive case itself.

Instead of disputing this point factually, Chevron urges this court to adopt the trial court's definition of bias as meaning, "an inclination in temperament and outlook: esp: a highly personal and unreasonable distortion of judgment," a definition drawn from Webster's Dictionary. We do not adopt this approach.

41

The bias necessary to constitute prejudice in juror misconduct cases is a tendency to unreasonably favor one aspect of the case over others, separate and apart from the juror's consideration of the evidence and the law applicable to the case. California statute defines actual bias as meaning "the existence of a state of mind on the part of the juror *in reference to the case, or to any of the parties*, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (§ 225, subd. (b)(1)(C), italics added.) The emphasized language demonstrates that the state of mind must be in specific reference to the case or to any party. The statutory language, notably, does not speak to the juror's state of mind in reference to the court, the judge, or the court's administrative rules.

Case law confirms this approach to understanding bias. Where juror misconduct consists of the introduction of improper "evidence" or other information to the deliberation room, courts look to whether that evidence tends to favor one side's view of the evidence on a critical point. (See, e.g., *Smith v. Covell* (1980) 100 Cal.App.3d 947, 953–954 [juror's comments in a personal injury suit that when his back " 'went out' it 'went out right away' " and he could still work afterward went to critically disputed issues in the case]; *People v. Resendez* (1968) 260 Cal.App.2d 1, 11 [juror's remarks "[did] not disclose a biased or prejudiced mind against appellant"].) In situations where an ineligible juror has nonetheless served, the prejudice question again focuses on the juror's prejudice in relation to some aspect of the case, i.e., the dispute between the parties which the jurors are asked to resolve. (*In re Manriquez* (2018) 5 Cal.5th 785, 818 ["Although it was misconduct for Juror C.B. not to answer the pretrial juror questionnaire accurately, there is no substantial likelihood she was actually biased *against petitioner*." (Italics added.)]; *People v. Green* (1995) 31 Cal.App.4th 1001, 1019–1020 [finding the presumption of prejudice rebutted because "the trial court expressly found after an extensive inquiry that [the ineligible juror] had no actual bias against defendant"].)

Bias does not *necessarily* mean bias for or against a particular party. Bias could pertain to some other aspect of the substantive case that renders a juror unable to be impartial toward the weighing of the evidence and consideration of the law. For instance, our Supreme Court has noted a juror may "harbor a general bias against a class of witnesses" which prevents them from fairly considering the case. (*In re Manriquez*, *supra,* 5 Cal.5th at p. 812 [noting other cases had upheld the mid-deliberations removal of a juror who believed " 'police officers in Los Angeles generally lie' "]; see also *People v. Barnwell* (2007) 41 Cal.4th 1038, 1051.)

Similarly, bias may exist against the laws to be applied in a particular case. Our Supreme Court has long noted that, while juries have the power to nullify a criminal charge due to the practicalities of our legal system, such a verdict is not lawful; it is merely unreviewable and therefore insulated from challenge. (See *People v. Williams* (2001) 25 Cal.4th 441, 449–451, *disagreed with on other grounds by Barnwell, supra*, 41 Cal.4th 1038.) However, the fact such power is held by the jury does not prevent the removal of a juror who affirmatively states they will not follow the law. (*Id.* at pp. 459–460; see also *People v. Engelman* (2002) 28 Cal.4th 436, 441 ["The Court of Appeal was correct in determining that the jury has the duty to follow the court's instructions and that the jury lacks the right to engage in nullification."].)

The foregoing types of bias are directed at the *substantive case itself*, not the administrative rules of the court. While the trial court—indeed, all courts—certainly has the prerogative to manage its own docket and thus enforce compliance with its administrative rules (see *Walker v. Superior Court* (1991) 53 Cal.3d 257, 266–267), we are not confronted with a case in which the court removed Juror No. 10 for his refusal to follow masking rules and a party is appealing the juror's removal.

The only evidence of Juror No. 10 not following directions was in relation to the court's masking rules. After several jurors were excused due to COVID-19, and the court

43

imposed more drastic precautions, the court questioned each of the jurors about their willingness to abide by the rules of the courthouse and mask. Juror No. 10 stated he felt "invested in this case" and would "like to remain a juror," but stated unequivocally, "I am not wearing a mask again. I did it for a year, and I'm not doing it anymore, I'm done. I've had COVID, and I'm fully vaccinated, and I'm done with the mask. I'm not wearing a mask at any time, anywhere, for anybody." Additionally, the court later noted a situation in which Juror No. 10 refused to wear a mask on the jury transport bus, was prevented from boarding it, and elected to cross over a set of train tracks on foot to get to the courthouse, thus delaying the proceeding. This flaunting of administrative rules clearly irked the court, which noted numerous times in the order for a new trial that the juror had ignored its orders, required special accommodations, and refused to be masked. The court described Juror No. 10 as "obstinate, untruthful, obstreperous, contemptuous, ineligible[ ] and entitled."

Certainly, in appropriate cases, a trial court has the ability to remove jurors who simply refuse to follow the court's procedural rules, even those which have nothing to do with the substantive case the juror is being asked to decide. Here, the question presented is whether, *after* a verdict has been rendered, that verdict should be set aside because of a juror's bias against the court's administrative rules, particularly its rules related to masking. The answer is no. This is not the type of "bias" that shows the losing party was prejudiced in any way by this juror's participation. While in some cases juror dishonesty might be indicative of prejudgment or bias, the nature and seriousness of the misconduct here weighs against finding a substantial likelihood of bias against Chevron, because Juror No. 10's only exhibited "bias" was against masking and the court's administrative rules in that regard.

>> 3. *Probability actual prejudice occurred and vote counting.*

The parties have addressed an aspect of the prejudice analysis involving vote

44

counting. A critical difference between criminal and civil jury trials is that unanimity is required for criminal convictions, where only a supermajority is required to find a civil defendant liable. (See Cal. Const., art. I, § 16.) Therefore, the impact of juror misconduct necessarily varies between civil and criminal cases. TRC argues, in essence, for a per se rule that, in civil cases, if enough votes were left in favor of liability, there can be no prejudice. Chevron argues for the opposite, suggesting any verdict which includes a biased juror must necessarily be set aside. Neither is correct.

Vote counting has been considered in determining whether a new trial was appropriately granted. (E.g., *Weathers v. Kaiser Foundation Hosp.* (1971) 5 Cal.3d 98, 110 ["Since the verdict was nine to three, the disqualification for bias of any one of the majority jurors could have resulted in a different verdict."]; *Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 785, 798 [affirming trial court's grant of a new trial only on claims that were decided by a nine to three vote, and not those decided by a ten to two, eleven to one, or twelve to zero vote, where misconduct was one juror's pre-judgment of the case].) As one court has explained: "in civil cases, where the court finds a 'substantial likelihood' that *enough jurors were impermissibly influenced by misconduct to have affected the verdict* to the detriment of the complaining party, there is 'reasonable probability of actual harm to the complaining party resulting from the misconduct.' " (*Glage v. Hawes Firearms Co.* (1990) 226 Cal.App.3d 314, 322–323, italics added.) Since civil juries need not be unanimous, "the number of tainted jurors needed to compel reversal will vary. For example, where a jury renders a unanimous verdict against the complaining party, evidence of only *one* impermissibly tainted juror does not compel reversal as in a criminal case because the remaining *untainted* jurors were sufficiently numerous to render a proper and fair verdict, and the record conclusively rebuts the presumption of prejudice." (*Id.* at p. 323 fn. 5, italics original.) Thus, vote counting, combined with an evaluation of whether the misconduct tainted

45

other jurors, can and has been used in evaluating whether actual prejudice is likely to have ensued.

However, vote counting is not the sole arbiter of whether prejudice has occurred, and we decline TRC's invitation to make it a per se determiner of prejudice. It is simply a tool, which is more useful in some situations and less useful in others. A brief example of this is presented by former Chief Justice Bird in *Ballard v. Uribe*, a personal injury case. In that case, two jurors said during deliberations that under no circumstances would they award anything for pain and suffering, regardless of what the law required. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 590–591 (conc. & dis. opn. of Bird, C.J.).) Chief Justice Bird noted this evidence of an unwillingness to follow the law as instructed by the court was serious misconduct. (*Id.* at p. 593.) Notwithstanding these statements, the jury unanimously returned an award for the plaintiff in the amount of $200,000. (*Id.* at p. 594.) In this circumstance, Chief Justice Bird explained the unanimity of the jury actually *increased* the likelihood the misconduct prejudiced the plaintiff, even though the jury found in his favor. (*Id.* at p. 595.) Because the verdict was unanimously in favor of plaintiff, it necessarily included the views of the two jurors who expressed a strong intention to disregard the law. (*Ibid.*) Because there was no evidence these jurors reversed course, or convinced the remaining jurors damages for pain and suffering were unwarranted on the facts of the case, "it appears likely that the verdict reflected a downward adjustment to accommodate those views." (*Ibid.*) Under these facts, "the potential for prejudice to plaintiff stems from the likelihood that their improper statements, made prior to the vote, influenced other jurors to agree to a lower, compromise damage award." (*Ibid.*) This example merely illustrates one way in which vote counting does not, on its own, resolve the issue of prejudice.

In this case, the jury voted 11-1 in favor of TRC, with only Juror No. 2 finding they would not have held Chevron liable. Even assuming Juror No. 10 was therefore

46

replaced with another juror who had voted for Chevron, the verdict would still have been sufficient to render a finding of liability against Chevron. The only misconduct here was Juror No. 10's dishonesty during voir dire by failing to disclose prior court cases in which he was involved. Neither of the court cases—a felony criminal case in Washington and a personal injury suit in which he was plaintiff—relate in any manner to the current case or are likely to have influenced Juror No. 10's impression of the current case. There is no evidence Juror No. 10's prior experiences with the courts were communicated in any way to the other jurors, much less influenced their votes or tainted them with a bias as to the parties or the issues being decided. In this situation, it is reasonable to use vote counting to support the conclusion that there was no substantial likelihood that actual prejudice to Chevron resulted from Juror No. 10's misconduct. Therefore, we conclude the presumption of prejudice was rebutted and the grant of a new trial should be reversed.

### G. *Even If Juror No. 10 Was Ineligible, There Was No Prejudice*

To aid the efficiency of any subsequent proceedings, we set forth how we would decide the appeal under an alternative interpretation of the juror eligibility statute that concludes Juror No. 10 was ineligible to serve on the jury. Under that alternative, the outcome here would remain the same because our determination that there was no prejudice to Chevron from Juror No. 10's service on the jury remains unchanged. (Cf. *People v. Miller* (2008) 482 Mich. 540, 552 [juror was statutorily unqualified to serve due to sex offense conviction; defendant offered no evidence that the juror was not impartial].)

To reiterate briefly, a court may grant a new trial for an "[i]rregularity in the proceedings of the … jury" that prevents any party from having a fair trial or for "[m]isconduct of the jury[.]" (§ 657, subds. 1, 2.) It appears that Juror No. 10's inclusion on the jury could be conceptualized either as an irregularity in the proceedings of the jury or the result of misconduct of Juror No. 10—namely, his intentional

47

concealment of facts establishing his ineligibility.  In either event, a new trial is authorized under section 657 only if the irregularity or misconduct materially affected the substantial rights of the moving party—that is, resulted in prejudice to Chevron. Under these principles, the "ineligibility of a juror is not a fatal defect."  (*People v. Green, supra,* 31 Cal.App.4th at p. 1019; see *People v. Evans* (1899) 124 Cal. 206, 210 [judgment affirmed where a juror was not a citizen].)  Stated another way, ineligibility does not create a conclusive presumption of prejudice.

Next, we address whether the analysis of prejudice is different when a juror is statutorily ineligible.  We resolve this legal issue by concluding the prejudice standard is the same.  The ineligibility, coupled with the intentional concealment of information pertaining to eligibility and other matters, still creates a rebuttable presumption of prejudice. (*People v. Green*, *supra*, 31 Cal.App.4th at pp. 1019–1020 [felony conviction rendered juror ineligible; rebuttable presumption of prejudice applied where juror concealed that conviction].)  That presumption is rebutted either by making "an affirmative evidentiary showing that prejudice does not exist *or* by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Hasson*, *supra*, 32 Cal.3d at p. 417, italics added.)  In conducting this inquiry, the court evaluates whether there is a "*substantial likelihood* that one or more jurors were actually biased against the defendant." (*In re Boyette, supra,* 56 Cal.4th at p. 890; see also *In re Hamilton, supra,* 20 Cal.4th at p. 296; *Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 58 ["Misconduct was prejudicial if there is a substantial likelihood that the juror was biased and that the misconduct affected the verdict."].)  For example, in *People v. Green*, *supra*, 31 Cal.App.4th 1001, the appellate court found "no indication in the record that [the ineligible juror's] status as an ex-felon affected his ability to be impartial" and concluded

48

the presumption had been rebutted because "[t]he record shows no actual harm from the misconduct." (*Id.* at pp. 1019–1020.)

Based on the foregoing principles, we again conclude that, even if Juror No. 10 was statutorily ineligible to serve, the trial court used the wrong definition of bias in its analysis of prejudice. The proper definition of actual bias in relation to members of a jury panel is "the existence of a state of mind on the part of the juror *in reference to the case, or to any of the parties*, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (§ 225, subd. (b)(1)(C), italics added.) Neither this court nor the trial court is free to substitute in a different definition where the Legislature has already defined the term. (*City of Chula Vista v. Drager, supra,* 49 Cal.App.5th at p. 560; *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047; *People v. Nesler* (1997) 16 Cal.4th 561, 581 [noting the bias necessary to constitute misconduct is the same as the "actual bias" necessary to warrant disqualification as a juror].)

Here, we need not separately discuss whether actual bias existed because our earlier analysis resolves that issue. Next, we assume the appropriate definition of bias is expansive enough to include Juror No. 10's hostility to the court's masking rules. Under this assumption, this bias must have affected the outcome of the proceeding to establish prejudice. (*Ovando, supra*, 159 Cal.App.4th at p. 58.) Our independent review agrees with the trial court's determination that "Juror No. 10 did not engage in overt misconduct during the deliberations which influenced the outcome." The court noted that, while Juror No. 10 was "undoubtedly opinionated and loud during the deliberations," this was "not itself a basis to overturn the outcome, and does not itself constitute misconduct." While Chevron presented one declaration from Juror No. 2 suggesting Juror No. 10 was overbearing during deliberations, TRC presented declarations from nine jurors indicating he was not, that deliberations were entirely civil, and that each juror was able to express

49

their views on the case. If Juror No. 10's vote removed from consideration, the remaining 10 votes in favor of TRC are sufficient to sustain the verdict because civil cases do not require unanimous jury verdicts. (Cal. Const., art. I, § 16; see *Weathers v. Kaiser Foundation Hosp., supra,* 5 Cal.3d at p. 110; *Grobeson v. City of Los Angeles, supra,* 190 Cal.App.4th at pp. 785, 798; *Glage v. Hawes Firearms Co., supra,* 226 Cal.App.3d at pp. 322–323, fn. 5; *City of Pleasant Hill v. First Baptist Church* (1969) 1 Cal.App.3d 384, 433; *La Gue v. Delgaard* (1956) 138 Cal.App.2d 346, 348.)

In sum, even assuming that Juror No. 10 was statutorily ineligible, the motion for a new trial should have been denied because the presumption of prejudice was rebutted by (1) the lack of any indication Juror No. 10 was biased within the meaning of section 225 and (2) the evidence showing his participation did not affect the outcome of the case.

## II. CHALLENGES RAISED IN CHEVRON'S CROSS-APPEAL

Having overturned the order granting a new trial for juror misconduct, we must address the issues raised in Chevron's cross-appeal. Those issues include whether the jury instructions on causation misstated the law; whether the evidence was sufficient to support the findings that Chevron caused TRC's harm; whether the damages were excessive; and whether additional jury findings were needed to support the award of prejudgment interest. We begin with whether the jury was properly instructed on the causation issues. If the instructions were correct, we will analyze whether the evidence was sufficient to support the jury's findings regarding causation and damages.

### A. *Procedural Background*

It is important to place the issue involving the causation instructions and the grounds raised in Chevron's JNOV motion in the context of how this case was ultimately presented to the jury, recognizing this case started in 2014, involved extensive discovery, dispositive motions, pretrial motions in limine, section 402 hearings, bifurcated pretrial

50

hearings, and written pretrial orders from the trial court. This case eventually proceeded to trial in 2021 on three identical causes of action brought by TRC and Chevron against each other: negligence, trespass, and private nuisance. Although the elements of wrongdoing for these torts differ, the elements of causation and harm are the same. (See *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 [three generic elements of a tort cause of action are wrongdoing, causation and harm].)

### 1. *Issues Severed from the Jury Trial*

Following the filing of numerous pretrial motions in limine shortly before trial, the court sua sponte severed or bifurcated several issues for its determination before jury selection, pursuant to section 598. The court considered two related issues arising from the pretrial motions: first, the causation issue of whether Chevron could be held liable for "lost profits or other economic damages which arise *solely* as a result of orders" by DOGGR (italics added); and second, whether TRC may "present the DOGGR Orders alone as evidence that Chevron's conduct caused TRC's economic harm."

In terms of background facts, which were undisputed, the trial court found DOGGR issued order No. 1012 on July 6, 2011, which found Well 20 was damaged and had been so since before 2008, and that prior efforts to construct containment facilities by Chevron had failed. Order No. 1012 required Chevron to cease steaming within 150 feet of the surface expression near Well 20, which would increase to 300 feet if steam or fluids were still coming to the surface after five days.

On July 19, 2011, DOGGR issued order No. 1014, which found that a surface expression near a TRC well, called "Bull 9," also began on June 21, 2011. DOGGR ordered TRC to cease steaming within 150 feet of both Well 20 and Bull 9, which would expand to 300 feet if fluids continued to surface after five days. TRC appealed that order, which stayed its enforcement automatically.

51

Ultimately, DOGGR issued emergency order No. 1015 on August 5, 2011, following new surface expressions and eruptions, prohibiting TRC from engaging in steam injection within 500 feet of the surface expression near Well 20. Later that month, on August 26, 2011, DOGGR expanded its restrictions in Emergency Order No. 1016, requiring that neither Chevron nor TRC engage in steam injection within 800 feet of the surface expression near Well 20 until DOGGR was satisfied the conditions creating the surface expressions were remediated.

These orders banning steam injection in the area remained in effect until April 3, 2015, when DOGGR issued emergency remedial order No. 1068 to TRC, which superseded emergency order No. 1016. On July 15, 2015, TRC and DOGGR agreed to terms of satisfaction of emergency remedial order No. 1068, wherein DOGGR found TRC had satisfied the order and approved TRC to resume injection operations. Thus, TRC was prohibited from steaming these wells from the summer of 2011 to the summer of 2015, a period of four years.

On the evidentiary question, the trial court sought to determine the purposes for which the DOGGR orders could be appropriately introduced into evidence at trial, including to show Chevron's negligence. It concluded there were a number of purposes for which the DOGGR orders could not be admitted, including proving what motivated DOGGR to issue those orders, that an emergency in fact existed, or that the orders were necessary "to protect life, health, property, and natural resources," as these were opinions not subject to the hearsay exception for official records. Rather, the DOGGR orders were admissible only to "prove that surface expressions are observed, that there was an industrial accident, and that DOGGR ordered certain cyclical steam limitations for a period of time." Additionally, the court noted expert opinion would be necessary for TRC to prove Chevron's negligence caused physical conditions on TRC's property that prevented it from engaging in cyclical steaming.

52

On the question of whether Chevron could be liable to TRC for economic damages which were *solely* the result of DOGGR orders, the court concluded Chevron could not. The court reasoned the DOGGR orders were not "the actions of first responders in the field," but rather demonstrated "an amount of considered reflection."[13] Ultimately, the DOGGR orders were not temporary ones, but remained in place for four years. While noting Chevron owed a duty to TRC as any landowner owes to its neighbors "not [to] unreasonably cause injury to TRC's neighboring property," this did not "extend to economic losses that result from the considered, independent, discretionary actions of DOGGR at its headquarters made remotely from events in the field." The court based this decision largely on the apparent non-emergent consideration given by DOGGR, noting: "Someone with expertise from DOGGR had to review the information presented and available and then decide to present the evidence and recommendations to the Supervisor of DOGGR. Someone from DOGGR had to draft and finalize the orders. The Supervisor had to consider the detailed terms of the orders and sign them and issue them."

Ultimately, the trial court agreed with Chevron's argument and held "Chevron may not be held liable for TRC's lost profits or other economic damages which arise *solely* as a result of the DOGGR Orders." (Italics added.) In essence, the court's holding determined that, if the DOGGR orders were *solely* responsible for particular items of harm[14] and thus the attendant damages suffered by TRC, Chevron would not have any liability for those damages.

---

[13] We do not necessarily agree with this analysis, as will become apparent later, but recount it here for background.

[14] Our use of the phrase "items of harm" is derived from the instruction to the jury that the amount of damages "must include an award for each item of harm that was caused by Chevron's wrongful conduct, even if the particular harm could not have been anticipated."

The court did not, however, prevent TRC from attempting to prove its claims independent of the DOGGR orders. The court's order permitted TRC to attempt to prove that, regardless of what DOGGR did or did not do, Chevron negligently maintained its own wells which caused physical damages to TRC's property, which required TRC, as a matter of prudence and safety, to cease steaming its wells between July 2011 and July 2015. In other words, if TRC could prove that the reason it stopped steaming was not solely or entirely due to the DOGGR orders, but rather Chevron's negligence was a substantial factor in creating conditions that were unsafe for steaming, then it could recover damages. This was the theory upon which TRC tried the case.

### 2. *Jury Instructions and Verdict Form*

Following evidence and arguments, the jury was instructed that both TRC and Chevron alleged claims against each other for negligence, trespass, and private nuisance and the elements of these claims were specified. With respect to the causation element in each claim, the jury was instructed that either Chevron or TRC's actions must have been a substantial factor in causing harm to the other. The court did not modify CACI No. 430, "Causation: Substantial Factor," and instructed the jury that "[a] substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm."

Using CACI No. 431, "Causation: Multiple Causes," the trial court instructed the jury that "[a] person's negligence may combine with another factor to cause harm. If you find that Chevron's negligence was a substantial factor in causing TRC's harm, then Chevron is responsible for the harm. Chevron cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing TRC's harm." A corresponding instruction was given about other causes of Chevron's harm.

54

A further instruction about causation addressed the affirmative defense asserted by both Chevron and TRC that the other party's own negligence contributed to the other party's harm. Using CACI No. 405, "Comparative Fault of Plaintiff," the trial court instructed the jury that to succeed on this affirmative defense, Chevron must prove "[t]hat TRC was negligent and that TRC's negligence was a substantial factor in causing its harm." The court gave a corresponding instruction for TRC's affirmative defense about Chevron's own negligence causing Chevron's harm.

The trial court also gave a causation instruction tailored to this case and based on the court's conclusion, following the bifurcated court trial, about the legal effect of the DOGGR orders. The instruction reads: "Neither party may be held liable for harms caused *solely* by the DOGGR orders *alone*." (Italics added.) We will adopt the parties' convention and refer to it as the superseding cause instruction. It was designed for the theory of the case Chevron was presenting to the jury, and told the jury it could determine some (or all) of either party's harm were, as a factual matter, caused by the DOGGR orders alone. If the jury determined this, then the other party could not be liable for the particular items of harm the jury determined were solely caused by the DOGGR orders.[15]

On the subject of damages, the jury was instructed that if a party proved any of its claims, the jury "must decide how much money will reasonably compensate [the injured party] for the harm" and "the amount of damages must include an award of each item of harm that was caused by" the wrongdoer's tortious conduct. When the instructions on damages and causation are read together, no compensation would be awarded for any "item of harm" caused solely by the DOGGR orders. The items of harm claimed by TRC were harm to its property and lost profits, including future profits.

---

**15**     This instruction could be described as a further explanation of the substantial factor test for causation. In other words, the wrongdoing of either TRC or Chevron could not be a substantial factor in causing harm that was caused solely by the DOGGR orders.

55

Using a modified version of CACI No. 3960, the trial court instructed the jury how to render a general verdict while determining the comparative fault by the parties. They were told to (1) decide the total amount of each party's damages; if any, (2) decide the percentage of responsibility that Chevron and TRC had for the damages incurred by each party; if any, and (3) reduce their total damages by the percentage of responsibility so determined.

The agreed-upon general verdict form called for a general verdict and presented the same four questions for each parties' claims. The verdict form did not segregate each cause of action. It first asked whether the respective party had proven any of its claims by a preponderance of the evidence and directed the jury to answer by checking "Yes" or "No." If the jury answered yes to the first question, it was directed to answer whether the opposing party had proven its statute of limitations defense, again by checking "Yes" or "No." If the jury said no to the second question, the third question asked the amount of damages the jury was awarding and provided a blank line for the dollar amount. The fourth question asked if the jury was awarding prejudgment interest and provided a place to check "Yes" or "No." Thus, the verdict form provided no place for the jury to report the percentages of fault it attributed to each party, or to set out what amount of damages, if any, it found were solely caused by the DOGGR orders. Rather, all of these calculations were to be completed by the jury before indicating only the final damages award on the verdict form.

We note the parties' election to use a general verdict is significant to our analysis because a general verdict "implies a finding in favor of the prevailing party of every fact essential to the support of his action or defense." (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 673; see also *Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1193; *Codekas v. Dyna-Lift Co.* (1975) 48 Cal.App.3d 20, 24.)

56

## A. The Jury Instructions Were Appropriate

We first consider whether the jury was properly instructed before addressing whether the findings made pursuant to those instructions were supported by substantial evidence. Chevron argues that the trial court erred by providing the jury with a multiple causes instruction (CACI No. 431), and by omitting certain proposed language from the superseding cause instruction. Additionally, although Chevron does not frame it as a challenge to the superseding cause instruction per se, it challenges whether the question of superseding cause was appropriately left to the jury to determine, arguing that our Supreme Court has imposed a different type of superseding cause analysis to cases involving governmental actions or orders. We conclude the jury instructions were not erroneous.

### 1. Standard of Review for Instructional Error

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 572.)

Whether a jury instruction is correct or erroneous is a question of law. (*Harb v. City of Bakersfield* (2015) 233 Cal.App.4th 606, 617.) As a result, whether a jury instruction misstates the law is subject to independent review on appeal. (*Ibid*.) If an instructional error occurred, the appellant also must establish the error was prejudicial. (*Ibid*.; see Cal. Const., art. VI, § 13 [miscarriage of justice].) An instructional error is prejudicial if there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached obtained. (*Harb*, *supra*, at p. 617.) Generally, the appropriate remedy for an instructional error that is prejudicial is a reversal of the judgment and a remand for a new trial. (See e.g., *Kinsman v. Unocal*

*Corp.* (2005) 37 Cal.4th 659, 683; *Harb*, *supra*, at pp. 610, 637.) These principles of appellate review apply regardless of whether Chevron's claim of instructional error arises from its appeal of the judgment or its appeal of the order denying the motion for a new trial.

### 2. Instructions on Multiple Causes and Substantial Factor Were Not Erroneous

Chevron contends the multiple causes instruction inappropriately permitted TRC to argue Chevron could still be liable for harm that Chevron caused in combination with the effects of the DOGGR orders. As explained below, this is precisely what the law allows. A jury is permitted to find liability so long as a party was a substantial factor in causing the harm, even if it combined with other causes to bring about the injuries.

Here, the parties presented evidence that, when viewed in the light most favorable to the parties presenting it, indicated there were potentially multiple causes of the harm that occurred. This made a multiple causes instruction appropriate. (*Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1157–1158.) Where there are multiple causal agents that arguably contribute to an injury or harm, courts "apply the 'substantial factor' test of the Restatement Second of Torts, section 423, which subsumes traditional 'but for' causation." (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 352 fn. 12; see also *In re Ethan C.* (2012) 54 Cal.4th 610, 640.) "A defendant's negligent conduct may combine with another factor to cause harm; if a defendant's negligence was a substantial factor in causing the plaintiff's harm, then the defendant is responsible for the harm; a defendant cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing the plaintiff's harm; but conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." (*Yanez v. Plummer* (2013) 221 Cal.App.4th 180, 187.)

58

The multiple causes instruction set forth in "CACI No. 431 is necessary to explain to the jury a 'plaintiff need not prove that the defendant's negligence was the sole cause of plaintiff's injury in order to recover. Rather it is sufficient that defendant's negligence is *a* legal cause of injury, even though it operated in combination with other causes, whether tortious or nontortious.' " (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 747; see also *Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 580; *Logacz v. Limansky, supra,* 71 Cal.App.4th at p. 1158.) Thus, "where a defendant's negligence is a concurring cause of an injury, the law regards it as a legal cause of the injury, *regardless of the extent to which it contributes to the injury.*" (*Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304, 1317–1318.)

Based on the foregoing principles of law, which are well established, we reject Chevron's argument that it was legal error to give instructions allowing the jury to award damages for harm caused by Chevron's conduct operating in combination with the DOGGR orders to bring about the harm. A defendant need be a substantial factor, but not the *only* factor, and the other factors causing injury need not be tortious themselves. Further, once a defendant's negligence has been found to be a substantial factor, the defendant is responsible for the whole of the injury, until that defendant has proven what portion of damages may be apportioned to other parties or non-parties. Accordingly, we conclude the multiple causes instruction and the substantial factor instruction accurately stated the law.

Next, we address the related argument made by Chevron's counsel during the posttrial JNOV hearing that there was a basis for the jury to apportion harm between Chevron and the DOGGR orders. However, Chevron never argued apportionment of liability to the jury. It is therefore unsurprising that the jury did not apportion damages between Chevron and the DOGGR orders, once it found Chevron liable. While Chevron

59

may have elected not to make this argument for strategic reasons at trial, that cannot be attributed to any error on the part of the trial court. The instructions to the jury were correct, directing it not to award damages for any item of harm to either party caused solely by the DOGGR orders. If the DOGGR orders were the sole cause of all or a part of the injuries, Chevron's or TRC's negligence could not have been a substantial factor in causing those injuries.

### 3. *The Superseding Cause Instruction Was Not Reversible Error*

The parties have referred to the following instruction as the superseding cause instruction and have characterized it as a modification of CACI No. 432: "Neither party may be held liable for harms caused solely by the DOGGR orders alone."[16] The first challenge to this instruction we consider is Chevron's contention that the trial court should have added context to the instruction by beginning it with the following sentence: "A party's liability does not extend to economic losses that result from the considered, independent, discretionary actions of DOGGR." We conclude the additional sentence requested was not necessary to avoid instructional error.

Chevron's proposed addition derived from page 17 of the trial court's 22-page tentative ruling dated July 12, 2021, which was issued following the initial severed phase of the trial. There, the court set forth the general rule about a property owner's duty to

---

**16** CACI No. 432 is titled "Affirmative Defense – Causation: Third-Party Conduct as Superseding Cause" and provides: [¶] "[*Name of defendant*] claims that [… *it*] is not responsible for [*name of plaintiff*]'s harm because of the later misconduct of [*insert name of third party*]. To avoid legal responsibility for the harm, [*name of defendant*] must prove all of the following: [¶] 1. That [*name of third party*]'s conduct occurred after the conduct of [*name of defendant*]; [¶] 2. That a reasonable person would consider [*name of third party*]'s conduct as a highly unusual or an extraordinary response to the situation; [¶] 3. That [*name of defendant*] did not know and had no reason to expect that [*name of third party*] would act in a [*negligent/wrongful*] manner; and [¶] 4. That the kind of harm resulting from [*name of third party*]'s conduct was different from the kind of harm that could have been reasonably expected from [*name of defendant*]'s conduct."

60

exercise ordinary care in managing its property and then stated: "However, as a matter of policy, Chevron's liability does not extend to economic losses that result from the considered, independent, discretionary actions of DOGGR at its headquarters made remotely from events in the field." This was merely a prefatory sentence providing context for the court's eventual order on page 22—that "Chevron may not be held liable for TRC's lost profits or other economic damages which arise *solely* as a result of the DOGGR Orders." (Italics added.) The prefatory sentence was part of the court's explanation of why its order was, in its view, correct. Chevron specifically requested this order and then used the order as the basis for the superseding cause instruction.

Our analysis of Chevron's contention that it was error to omit the additional sentence is guided by the principle that a court "need only 'give explanatory instructions when terms used in an instruction have a technical meaning peculiar to the law [citation].' " (*People v. McLeod* (1997) 55 Cal.App.4th 1205, 1216.) Here, the superseding cause instruction given by the trial court stated the rule of law adopted by the court in its order. None of the language in that instruction had a technical legal meaning that needed further explanation or context. Accordingly, we conclude further explanatory language was unnecessary.

Also, the additional explanatory language may have undermined the trial court's ruling by suggesting the jury could not hold Chevron liable if the DOGGR orders contributed to TRC's harms *in any way*, rather than only if the orders were the sole cause of some or all of the items of TRC's harm. While this is the argument Chevron wishes to advance now, it is not the argument it advanced before and during trial.

Most importantly, this argument is contrary to California law, which holds "it is sufficient that defendant's negligence is *a* legal cause of injury, even though it operated in combination with other causes, *whether tortious or nontortious*.' " (*Uriell v. Regents of Univ. of Cal., supra*, 234 Cal.App.4th at p. 747, italics added; see part II.B.2., *ante*.)

61

Therefore, the additional sentence proposed by Chevron was properly rejected since it could be interpreted in a manner contrary to applicable law.

### B.       *Substantial Evidence Supports the Verdict*

Next, we consider Chevron's arguments relating to the sufficiency of the evidence raised below in Chevron's motion for JNOV.

### 1.       *Standard of Review for Denial of JNOV*

When a trial court denies a motion for JNOV, the applicable standard of review depends on the type of issue raised on appeal. (*Cleveland v. Taft Union High School Dist.* (2022) 76 Cal.App.5th 776, 802.) When an appellant challenges the sufficiency of the evidence in support of the jury's factual findings, the substantial evidence standard of review applies. (*Ibid.*) Alternatively, when a challenge raises purely legal issues, the independent standard of review applies. (*Ibid.*) Because Chevron has challenged the sufficiency of the evidence and we have determined the jury instructions were correct, we apply the deferential substantial evidence standard.

### 2.       *Substantial Evidence Supports Finding That Chevron Caused Harm Independent of the DOGGR Orders*

Chevron contends the jury should not have rendered the verdict it did, and should have instead found the evidence was insufficient to show TRC was harmed by anything other than the DOGGR orders. More particularly, Chevron maintains expert opinion evidence was required to prove Chevron harmed TRC, and the harm was independent of the DOGGR orders. Chevron is correct that *components* of the causation analysis here were outside of the realm of commonplace experience of jurors, and as such, required expert testimony. However, there was ample expert testimony in those areas where it was necessary: namely, showing it was unsafe to engage in cyclical steaming in the area and Chevron was the cause of the surface expressions that rendered such practices unsafe. There were other components of causation—in particular, what motivated TRC, a

62

corporate entity, to stop steaming—which required no expert testimony, and would have been inappropriate for an expert to opine on.

At the outset, both parties agree the general conditions in the shared oil field were unsafe for steaming between 2011 and 2015. Both filed complaints against the other alleging the other party was responsible for the unsafe conditions. Both parties referenced the unsafe conditions in their opening statements. Both parties referred to the unsafe conditions in their closing arguments. No one has identified where in the record either party introduced evidence that it was, in fact, safe to steam in this area during the period in question.

Notwithstanding the absence of a dispute, substantive testimony was introduced at trial about the conditions of the oil field and that those condition made it unsafe to steam. For instance, Wayman Gore, a petroleum expert for Chevron, opined it was "unsafe to conduct" cyclical steaming "within 800 feet of the Well 20 surface expression site." Gore noted any time steam was reaching the surface of an oil field, it created a dangerous condition. Gore stated "neither Chevron nor TRC should have been steaming" within 800 feet of the Well 20 surface expression following the events of June and July 2011.

Other witnesses from both Chevron and TRC agreed with Gore's testimony. Richard Fortnum, Chevron's thermal diatomite team supervisor, testified it was unsafe to engage in cyclical steaming near Well 20. TRC's operations manager, Todd Rogers, testified TRC believed "there was a safety issue," and imposed a no steaming radius consistent with the DOGGR orders. Further, Charles Comfort, one of the owners of TRC, testified the company completed a number of projects meant to ameliorate the safety concerns, including a gabion wall, after which it sought to resume steaming based on its belief it was safe to do so.

The trial court summarized the state of the evidence regarding safety in the oil field during a colloquy with counsel outside of the presence of the jury addressing whether Chevron had opened the door to testimony about the Chevron employee's

63

death. The court stated it would not allow testimony into the employee's death, noting Chevron's extensive testimony about safety precautions "essentially remove[s] safety as an issue in the court's mind. Chevron says surface expressions are a significant safety concern, and then TRC counsel Dylan Proctor made the point in the bifurcated proceedings that it doesn't take expert testimony to establish the issue that it was unsafe to produce within an 800-foot radius, and that's essentially established in the evidence, nobody's arguing it was safe." Neither party disagreed with the court's statement, which is unsurprising because both parties' affirmative claims against each other necessarily relied on the fact that the conditions existing in the oil field made it unsafe to cyclically steam.

Consequently, the main dispute at trial and on appeal is which party caused the unsafe conditions to exist, TRC or Chevron. Competent expert evidence was introduced by TRC that Chevron's negligence caused the unsafe conditions to exist and caused the harm to TRC. Gardner Walkup testified as an expert witness for TRC on the

reasonableness of Chevron's operations and whether TRC had suffered harm due to Chevron's actions. He opined Chevron's prior attempts to abandon Well 20 had failed, which provided a pathway for steam and fluids injected into other wells to move laterally through upper layers of the earth and form a surface expression. Walkup opined Chevron was not appropriately managing the risks of cyclical steaming on its property. He testified the French drain Chevron installed, Chevron's injections of steam into Well H235, and the generally compromised area surrounding Well 20 combined to cause the high energy eruptions in the summer of 2011. Walkup also stated it was imprudent and unreasonable to install the French drain where Chevron located it. Walkup also opined that Chevron's actions caused further eruptions in August 2011 and caused an accumulation of fluids on TRC's property, which harmed TRC. Ultimately, Walkup concluded Chevron was the cause of the instability in the area being steamed and its

64

actions were not prudent or reasonable.

TRC also called Charles VanAllen, another expert witness in cyclical steaming and petroleum engineering. VanAllen testified Chevron's wells had integrity problems, which caused the Well 20 surface expression. Further, he commented Chevron had over-injected the well with steam, and much of the liquid was being drained by TRC on a regular basis. According to VanAllen, a prudent and reasonable operator would not have installed the French drain the way Chevron did and would not have steamed nearby Well H235, both of which were connected to the high energy eruptions during the summer of 2011.

Chevron introduced contradictory expert testimony from Gore and others suggesting TRC was responsible for the unsafe conditions. However, it was the jury's responsibility to resolve the disputes between these experts, and the jury determined TRC's experts were more persuasive. The jury's general verdict in favor of TRC requires us to infer the jury found the testimony of TRC's experts credible, an unsafe condition existed, and Chevron's negligence caused the unsafe conditions. Because the opinions of TRC's experts constitute substantial evidence that Chevron's wrongdoing caused the unsafe conditions, we must uphold the jury's findings.

> 3. *Substantial Evidence Supports the Jury's Conclusion that Chevron's Actions were The Cause of TRC's Cessation of Its Steaming Operations.*

Having decided which issues needed to be proven through expert testimony, we next consider the remaining causation issue—that is, whether these unsafe conditions harmed TRC, or whether TRC's harms were caused by DOGGR ordering it to stop steaming. In the latter case, DOGGR may have been a superseding cause of the harm, which would absolve Chevron of liability. This issue requires us to consider what *motivated* TRC to stop steaming: the unsafe conditions themselves or the DOGGR

65

orders. If it was the former, the DOGGR orders were merely incidental and therefore did not supersede the harm because TRC would not have steamed anyway. If it was the latter, the jury was instructed to determine whether the DOGGR orders were the sole cause of some or all of the items of harm.

Whether TRC decided to stop steaming because of the unsafe conditions or because of the DOGGR orders presented an issue of fact for the jury to decide. This question of motivation does *not* require expert testimony because a jury is well situated based on common experience to fully evaluate the credibility of the witnesses testifying to said motivation and determine whether the proffered motivations for a business decision were genuine.[17]

Several TRC executives testified about the company's motivation for ceasing its cyclical steaming in 2011. Tracy Rogers, president and an owner of TRC, testified TRC stopped steaming approximately 65 to 70 percent of its wells for "safety reasons." Rogers, the operations manager for TRC and Tracy's brother, indicated TRC "shut in some of our production in the area" as a result of the accidents that happened in the summer of 2011. Todd Rogers testified that, after the initial events in June 2011, TRC stopped steaming certain wells located close to the incident, but continued steaming wells farther away. However, the eruptions in August 2011 caused TRC to stop steaming nearly 60 percent of its wells, because it was "concerned about the safety of the employees on our lease and the steaming in the area." Todd Rogers commented that, after DOGGR issued its orders, "TRC agreed with the DOGGR orders that there was a safety issue involved with what had happened on the Chevron side of the property."

---

[17] The trial court recognized this, and in fact overruled an objection from Chevron's counsel that Tracy Rogers' testimony about this reasoning was improper, noting, "I don't think it's improper lay opinion. He's president of the company. He's saying why they shut their operations down. He can be impeached and other evidence may impeach that testimony." This evidentiary ruling was not appealed by Chevron.

Aaron Rhoten, TRC's manager of asset development and a co-owner of one of the TRC entities, testified TRC not only stopped steaming because it had to comply with the DOGGR orders, but also because "it was unsafe to steam." Comfort, TRC's secretary, treasurer, and co-owner, testified similarly, noting that following the June 2011 eruptions, TRC stopped steaming some of its wells voluntarily, because it had "safety concerns." Comfort noted he agreed the DOGGR orders implementing a steam ban radius were reasonable after the August 2011 eruptions, because of the safety concerns he had with steaming.

Chevron impeached each of these witnesses' testimony about TRC's motivations. Chevron questioned Tracy Rogers about whether TRC had ever considered imposing its own steam bans prior to the month DOGGR ultimately ordered a ban on steaming. Similarly, Todd Rogers was questioned about whether TRC had appealed the DOGGR orders to stop steaming. Rhoten was questioned about whether the only reason TRC stopped steaming was because of the DOGGR orders, and cross-examined about the categories of damages TRC was seeking from Chevron. Comfort was asked at length by Chevron about TRC's failure to document in writing that it was ceasing steaming for safety reasons and about whether its true motivation for stopping steaming and conducting repair work was the DOGGR orders, as opposed to its safety concerns. Additionally, Chevron cross-examined other witnesses, including TRC's expert witnesses VanAllen and Walkup, about whether TRC's damages were solely caused by the issuance of orders by DOGGR. Impeachment testimony from these witnesses' depositions was read throughout each of the cross-examinations. Further, the impeachment was repeatedly referenced in Chevron's closing argument.

On appeal, Chevron contends these witnesses were "thoroughly impeached" by their deposition testimony on what TRC's motivations were. However, arguments that a witness was impeached on a particular factual point do not support granting a motion for

67

JNOV. (*Wright v. City of Los Angeles* (1990) 219 Cal.App.3d 318, 343 ["When presented with a motion for judgment notwithstanding the verdict, the trial court 'cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.]' "].) More generally, appellate courts recognize they must accept a trier of fact's express or implied findings that some or all of a witness's testimony is credible unless the testimony is incredible on its face, inherently improbable, or wholly unacceptable to reasonable minds. (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 786.)

The jury was presented with conflicting evidence regarding whether TRC's motivations for ceasing its steaming were due to safety concerns, or due to the DOGGR orders. By awarding TRC the damages it requested and awarding Chevron nothing, the jury impliedly found the testimony of TRC's witnesses about the company's motivation was credible. Under the applicable appellate standard, we cannot conclude that testimony was incredible on its face, inherently improbable, or wholly unacceptable to reasonable minds. Therefore, we must accept the jury's implied credibility findings. Based on those credibility findings and the substance of the testimony offered, we conclude substantial evidence supports the jury's findings that the unsafe conditions, not the DOGGR orders, caused TRC's harm. (See *Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1407 ["uncorroborated testimony of one witness can constitute substantial evidence, unless the testimony is inherently unreliable"].)

### 4. *The DOGGR Orders Were Not, As a Matter of Law, the Superseding Cause of TRC's Harm*

Our legal conclusion that the jury instructions on causation were proper and our subsequent determinations that substantial evidence supported the jury's finding on the causation issues provide adequate grounds for rejecting Chevron's argument that the

68

DOGGR orders were, as a matter of law, the superseding cause of TRC's harm. Nonetheless, here we address Chevron's argument from another perspective.

In its posttrial motions Chevron argued the DOGGR orders were a superseding cause of TRC's damages as a matter of law and did not present a jury question. Chevron based this argument on language in the "Scope of Liability" section of the trial court's July 12, 2021 tentative ruling, where it stated: "For interrelated reasons, the court determines as a matter of law that Chevron *is not* liable for TRC's lost profits or other economic damages which result solely from the DOGGR orders." (Italics added.) This sentence, however, is not reasonably interpreted as the trial court finding, as a matter of law, that as a factual matter, TRC's damages actually resulted solely from the DOGGR orders. The court's order, six pages later, stated that "the court adjudicates as a matter of law that Chevron *may not* be held liable for TRC's lost profits or other economic damages which arise solely as a result of the DOGGR Orders." (Italics added.) With Chevron's concurrence, this language was incorporated into the superseding cause instruction given to the jury. At trial, both parties argued that solely meant "only resulting from" the DOGGR orders. When the court denied Chevron's motion for JNOV, it stated that Chevron's posttrial argument contradicted what Chevron argued at trial when it treated superseding cause as a jury question. For purposes of this appeal, we exercise our discretion to forego the arguments about Chevron forfeiting this issue or inviting error, and resolve the merits.

As referenced above, case law defines a "superseding cause" as "an independent event [that] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen that the law deems it unfair to hold him responsible." (*In re Ethan C., supra,* 54 Cal.4th at p. 641.) Put another way, an intervening cause "is one that actively operates to produce harm after the defendant's negligent act or omission has been committed"; it then becomes a

69

*superseding* cause if it is "highly unusual or extraordinary, not reasonably likely to happen and, therefore, not foreseeable." (*Arreola v. County of Monterey* (2002) 99 Cal.App.4th 722, 760.)

Whether something is a superseding cause usually is a question of fact. (*Arreola v. County of Monterey, supra,* 99 Cal.App.4th at p. 760; see also *Ballard v. Uribe, supra,* 41 Cal.3d at p. 572, fn. 6; *Springmeyer v. Ford Motor Co.* (1998) 60 Cal.App.4th 1541, 1558 [" '[F]oreseeability is question for the jury unless undisputed facts leave no room for a reasonable difference of opinion,' and '[t]hus, the issue of superseding cause is generally one of fact.' "]; *S. Cal. Edison Co. v. Harnischfeger Corp.* (1981) 120 Cal.App.3d 842, 853.) Many cases, however, hold that where the facts are susceptible of only one reasonable interpretation, superseding causation becomes a question of law. (E.g., *Arreola v. County of Monterey, supra,* 99 Cal.App.4th at p. 760; *Brewer v. Teano* (1995) 40 Cal.App.4th 1024, 1035 (*Brewer*).) Chevron relies on cases where the appellate court determined as a matter of law that a superseding cause existed and argues we can reach the same determination in this case.

Chevron's argument is based primarily on a California Supreme Court case that suggests a special exception to the typical "foreseeability" approach to superseding causes where the defendant sought permission from a court before causing the alleged injury. In *Manta Management Corp. v. City of San Bernardino* (2008) 43 Cal.4th 400 (*Manta*), the city enacted an ordinance prohibiting the operation of adult businesses in "regional commercial" zones, but permitting them in heavy commercial or light industrial zones. (*Id.* at pp. 403–404.) Manta opened a comedy club in a regional commercial zone, but after approximately six months of operation, turned it into an adult cabaret. (*Id.* at p. 404.) Manta was therefore out of compliance with the city's ordinance, but did not cease its operations; instead, it continued operating as an adult cabaret until the city filed a lawsuit and obtained a preliminary injunction preventing it from doing so. (*Id.* at pp.

70

404–405.) More than a year later, the trial court dissolved the preliminary injunction, having found the ordinance was an unconstitutional infringement on Manta's First Amendment right to free speech. (*Id.* at p. 405.) The city appealed and was granted a writ of supersedeas pending appeal, thereby continuing Manta's inability to operate its adult business. (*Ibid.*) The Court of Appeal eventually affirmed the trial court's decision to dissolve the preliminary injunction and vacated the writ of supersedeas, allowing Manta to resume operations. (*Ibid.*)

The parties then proceeded to trial on Manta's cross-complaint filed in the original enforcement action, which included a claim under 42 United States Code section 1983 seeking damages against the city for enacting and enforcing an unconstitutional ordinance. (*Manta, supra,* 43 Cal.4th at p. 405.) The trial was bifurcated into a court trial on liability and a jury trial on damages. (*Ibid.*) The trial court held during the liability phase "that the acts of 'precipitating' the preliminary injunction and stay were an effort to enforce an unconstitutional zoning ordinance," and could serve as a basis for a section 1983 claim. (*Manta, supra,* at p. 405.) The trial court notably "did not find that the city's ordinance itself was a basis for section 1983 liability." (*Ibid.*) The jury awarded Manta $1.4 million in damages for profits lost while the injunction was in effect. (*Ibid.*) The city appealed, claiming it "could not be liable for damages under section 1983 because it had sought redress through the courts." (*Ibid.*) The Court of Appeal affirmed the judgment, holding the city's reliance on the trial court's issuance of the preliminary injunction did not provide it with immunity. (*Id.* at pp. 405–406.)

The Supreme Court granted review and reversed. Analyzing the section 1983 cases, the court noted that the law concerning causation in such cases typically follows the common law of torts, because section 1983 provides a cause of action but does not itself set forth substantive law dictating what claims may be brought. (*Manta, supra,* 43 Cal.4th at pp. 407–408.) The court observed it was not considering whether the

71

ordinance *itself* could serve as a basis for section 1983 liability, but rather only whether the *acts of enforcement* could: "[T]he ordinance caused Manta no harm because Manta did not abide by it. Manta suffered no monetary damages until the trial court enjoined its operating an adult cabaret where its comedy club had been located. The issue before us is whether the city's *act of seeking an injunction* to enforce the ordinance dealing with the location of adult businesses and its subsequent *act of filing a petition for writ of supersedeas* to obtain a stay pending appeal 'caused' the harm suffered by Manta to the extent that the city is liable for damages Manta incurred during the 53 months the injunction and the stay were in place." (*Manta, supra,* at p. 407.) Thus, the question was not one of immunity, as the Court of Appeal had thought, but rather one of causation, namely, whether the specific acts of enforcement could be a legal cause of the injury suffered. (*Id.* at p. 408.)

The Supreme Court discussed the history of section 1983 law, noting numerous instances where municipalities had been liable for damages for unconstitutional ordinances in various contexts, but observing none involved "a situation in which a court sanctioned the city's enforcement of its ordinance *before* the ordinance was found to be unconstitutional." (*Manta, supra,* 43 Cal.4th at pp. 408–409, italics added.) It then reviewed cases from the Second, Third, Fifth, and Eleventh Circuit Courts of Appeal, as well as the Michigan Court of Appeals, all of which held that, where a civil plaintiff or a criminal prosecutor had made an application to a court—either for an injunction or to hold a defendant to answer—and had presented accurate information to the court, that party and its agents could not be held liable for damages arising because the court granted the application, whether in the form of an injunction or a criminal charge. (*Id.* at pp. 409–411.) This was because the court's neutral evaluation of admittedly accurate facts broke the chain of causation between the alleged wrongdoing (i.e., the enforcement of an unlawful ordinance or an illegal search-and-seizure leading to arrest) and the damages

72

suffered—that is, lost profits following an injunction or damages related to a subsequent criminal trial and incarceration. (*Ibid.*) Ultimately, our Supreme Court held, "where a court is provided with appropriate facts to adjudicate a motion for preliminary injunction or a motion for a stay pending appeal, the courts' intervening exercise of independent judgment breaks the chain of causation for purposes of section 1983 liability." (*Id.* at p. 412.) It also adopted an exception where "the judicial officer reached an erroneous decision as a result of being pressured or materially misled as to the relevant facts." (*Ibid.*)

The question presented, therefore, is whether the DOGGR orders, like the preliminary injunction and writ of supersedeas issued in *Manta*, break the causal chain. We conclude the facts of *Manta* are readily distinguishable from the facts surrounding the DOGGR orders. Setting aside the question of whether the holding of *Manta* can be extended to a government decisionmaker other than a court,[18] a critical feature of *Manta* is that no injurious event occurred *before* one party (the city) sought the intervention and independent decision-making of the neutral third party (the court). Manta suffered no harm at all—because it was ignoring the ordinance and pursuing its business—until the trial court issued an injunction against it. Other California cases have held similarly, where no injury was alleged to have arisen until *after* an independent third-party had sanctioned the activity in question. (See *Novick v. City of Los Angeles* (1983) 148 Cal.App.3d 325, 331–334 [no damages sought for unlawful search, but rather only for

---

[18] Both *Manta* itself and most of the cases it relied on involved situations in which the prosecutor or government agency successfully applied to a *court*, either for an injunction or to hold a defendant to answer for a criminal charge, and the alleged damages arose after the court had granted the injunction or held the defendant to answer. It is not obvious the same assumption of independence applies where the decisionmaker is not a third-party neutral adjudicator of disputes, but rather an administrative agency such as DOGGR, which is charged with enforcement of certain statutes and regulations.

criminal prosecution stemming from unlawful search, for which intervening prosecution decision broke chain of causation].)

Here, the circumstances are not analogous because Chevron did not request that DOGGR issue a shut-down order before the eruptions of steam and oil on its property damaged TRC's property, killed one of Chevron's own employees, and rendered it generally unsafe for either TRC or Chevron to engage in cyclical steaming. Nor did DOGGR condone, permit, or direct Chevron to cause such eruptions. In other words, DOGGR did not sanction *any* of Chevron's activities *before* the injurious event happened. Rather, this is a case in which injurious events *had already happened*, and DOGGR was forced to respond to that physical reality. In that capacity, DOGGR was not acting as a neutral intermediary, refereeing a dispute between two parties. Instead, DOGGR was acting as regulator, addressing a dangerous situation that required action.

While DOGGR may have internally deliberated about how best to respond, interpreting *Manta* to mean that *any* intervention and exercise of discretion by *any* government agency will break the chain of causation as a matter of law goes too far. A critical fact in *Manta* is that the damages sought could *only* be traceable to the court's impartial decision, because Manta indisputably was not injured before the court enjoined its operation. The Supreme Court specifically noted the trial court's finding that the city was not liable for the ordinance, but rather only the acts that precipitated enforcement of the ordinance. (*Manta, supra,* 43 Cal.4th at p. 405.) Here, TRC presented evidence showing it was harmed because the conditions Chevron caused made it unsafe to steam, and these conditions were created before DOGGR ever intervened or exercised any discretion in the matter.

In *Manta*, the Supreme Court supported its conclusion that a city was not liable for applying to a court for enforcement of its ordinance by citing *Brewer, supra,* 40 Cal.App.4th 1024, which invoked the concept of foreseeability in its analysis of

74

superseding causes.  In *Brewer*, Teano recklessly drove his car so that it repeatedly collided with Brewer's car.  (*Id.* at p. 1027.)  Brewer was afraid he would be assaulted by Teano if he pulled over and stopped, so he left the scene, but was spotted doing so by a bystander and reported to the police.  (*Ibid.*)  Brewer was arrested and held to answer for a felony hit-and-run, but was not convicted.  (*Ibid.*)  He then sued Teano's estate—Teano having died—seeking damages for, among other things, injuries related to his prosecution, such as the costs of retaining an attorney to defend the criminal charges.  (*Id.* at 1028.)

The appellate court concluded Teano's estate could not be liable for such damages by using the commonplace foreseeability analysis and asking whether the harm was "different in kind" from that which would normally be expected, whether the consequences were "extraordinary rather than normal" in light of the circumstances, and whether the intervening force was not a "normal result" of the defendant's actions. (*Brewer, supra,* 40 Cal.App.4th at p. 1031.)  The court noted these principles from the Restatement had been distilled by Witkin, noting "if the risk of injury might have been reasonably foreseen, the defendant is liable, but that if the independent intervening act is highly unusual or extraordinary, not reasonably likely to happen and hence not foreseeable, it is a superseding cause, and the defendant is not liable."  (*Id.* at 1032.) After reviewing these principles and other applicable law, the court stated:  "The criminal prosecution in this case was not an immediate reaction to an on-the-scene situation, but the product of what, we must assume, was the considered and careful judgment of a number of persons." (*Id.* at 1036.)  Because the criminal prosecution was not a foreseeable consequence of Teano's conduct, it was not something for which Teano's estate could be liable. (*Ibid.*)  However, the court declined to decide whether Brewer could seek damages from Teano's estate for the *arrest*, which it held was a closer

75

question than seeking damages posed by the prosecution, and therefore required factual development and potentially jury resolution. (*Id.* at p. 1037.)

We take from *Manta*'s reliance on *Brewer*, including the language of foreseeability, that our Supreme Court did not intend to depart wholesale from foreseeability as the touchstone of superseding causation, merely because a governmental entity exercised some independent discretion in relation to the matter. Rather, we interpret *Manta* to mean that there are certain situations—namely, where a party has applied to a court for intervention and has not otherwise caused harm without court approval—that superseding cause can be determined as a matter of law. *Manta*, in other words, can be seen as an application of the foreseeability analysis, not a departure from it.

In this case, however, it cannot be said that the intervention of the state oil and gas regulator was an "extraordinary" response to Chevron's negligently engaging in cyclical steaming that caused repeated explosions and eruptions in an oil field. Nor is the intervention of the regulator in this type of situation highly unusual, or not a "normal result" of these types of catastrophes. It is, in fact, exactly what one would expect. Thus, it was foreseeable. Based on this foreseeability analysis, we cannot find, as a matter of law, that DOGGR's intervention was a superseding cause of TRC's harm.

Accordingly, the trial court did not err in failing to conclude the DOGGR order operated as a complete bar to TRC's claims, as Chevron now argues. Thus, we reject Chevron's argument on its merits, and do not discuss whether Chevron invited the purported error.

### 5. *Substantial Evidence Supports the Amount of Damages Awarded.*

Chevron appeals the trial court's denial of its motion for a new trial on the grounds that the damages award was excessive. According to Chevron, *some* of the damages requested by TRC must have been caused by the DOGGR orders, and because the jury

76

awarded TRC the full amount of its requested damages, it must have awarded some damages caused by the DOGGR orders, which Chevron argues should have been superseded. This argument, however, is not supported by a reasonable interpretation of the jury's verdict.

As stated in part II.B.2., *ante*, where a tortfeasor's actions cause injury, whether combined with other tortious or nontortious sources of injury, and that tortfeasor is a substantial factor in causing harm to the plaintiff, the plaintiff may recover the entirety of the amount—less what can be segregated or apportioned—from the tortfeasor. (*State Dep't of State Hospitals v. Superior Court, supra,* 61 Cal.4th at p. 352, fn. 12; *Uriell v. Regents of Univ. of Cal., supra,* 234 Cal.App.4th at p. 747; *Yanez v. Plummer, supra,* 221 Cal.App.4th at p. 187; *Logacz v. Limansky, supra,* 71 Cal.App.4th at p. 1158; *Espinosa v. Little Co. of Mary Hospital, supra,* 31 Cal.App.4th at pp. 1317–1318; *Hughey v. Candoli, supra,* 159 Cal.App.2d at p. 240.) If the tortfeasor believes its wrongdoing did not cause or contribute to some portion of a tort plaintiff's injuries, it "must carry the burden of establishing that ... or the extent to which it did so." (*Hughey v. Candoli, supra,* at p. 240; see also *Maggio, Inc. v. United Farm Worker* (1991) 227 Cal.App.3d 847, 867–868 [where tort injury was caused by both legal and illegal activity which defendant did not attempt to segregate, defendant was liable for entirety of damages]; *De Corsey v. Purex Corp.* (1949) 92 Cal.App.2d 669, 676 ["[I]f the assumed defective condition of the bottle combined with the excessive pressure caused plaintiff's injuries the burden of segregating the damages due to one cause or the other was upon the defendant."].) Under these principles, Chevron bore the burden of proving its argument that the damages were severable, and certain damages should be assigned *solely* to the DOGGR orders.

Although Chevron criticizes the evidence TRC put on, it points to no evidence or argument by which it attempted to carry its burden of segregating items of harm attributable to TRC's actions, the DOGGR orders, or both. The absence of evidence on

77

this specific point is explained by Chevron's own affirmative claim for damages and theory of the case that TRC was solely responsible for creating the conditions that led to the unsafe oilfield and the DOGGR orders. Chevron attempted to convince the jury that TRC's own negligence was solely responsible for both Chevron's and TRC's damages and that it was not responsible for *any* of TRC's damages because it was not negligent. Had Chevron sought to show it was only responsible for some of the items of harm suffered by TRC, it might have been seen by the jury as conceding it was negligent. Chevron's all or nothing litigation strategy was inherently a high-risk, high-reward approach.

The verdict form also reflects the parties' high-risk, high-reward strategy, because it asked the jury to render a general verdict without any special findings or apportionment of causation or damages. The verdict form contained no space for the jury to "show its work" in assessing comparative fault. Instead, the jury was instructed that both Chevron and TRC claimed the other's negligence contributed to any harm suffered. It was then given a general verdict instruction on comparative fault, telling the jury that, if it found comparative fault, it was to decide the amount of damages, decide the percentage of fault each party was to bear, and then reduce the damages by that percentage, and write *only* the "reduced damage award in your verdict." Because we must presume the jury followed the instructions and the jury awarded the exact amount TRC requested, we must infer the jury found TRC was zero percent at fault, none of the harm suffered by TRC was caused solely by the DOGGR orders, and all of those items of harm were caused by Chevron's negligence.

Chevron's argument is seemingly predicated on the assumption *TRC* was required to present segregated evidence of its damages caused by Chevron and caused by the DOGGR orders. The law does not require this. Once the jury found Chevron to be a substantial cause of TRC's injuries, TRC had no burden to apportion damages. Rather, if

78

Chevron wished to reduce the property damage or lost profits for which it might be responsible, it was Chevron's burden to show which items of harm were solely attributable to the DOGGR orders, a burden it does not even suggest it attempted to meet.

To the extent Chevron suggests TRC lacked sufficient expert evidence of its losses, such an argument also fails. TRC introduced evidence from Walkup that, using expert mathematical analyses, calculated the decline in production caused by TRC not steaming its wells. TRC's expert Patrick Kennedy testified about what that decline in production cost TRC in terms of lost profits, ultimately opining TRC's total damages were $73,039,191, which was the amount the jury awarded.

This expert testimony was not based on an assumption about what caused TRC to stop steaming. Chevron specifically prevented both experts from offering that kind of testimony, and neither opined about why TRC stopped steaming. As discussed above, the corporate motivation for TRC to stop steaming its wells was not one that required expert testimony.

Consequently, we conclude the general verdict awarding TRC $73,039,191 is supported by substantial evidence, which included Kennedy's testimony about the amount of damages TRC suffered. Concluding the DOGGR orders must have caused some items of harm suffered by TRC is inappropriate because it contradicts the implied findings of fact underlying the general verdict.

E.     *Chevron Forfeited Objections to the Verdict Form's Treatment of Prejudgment Interest*

Chevron also challenges the verdict form and the award of prejudgment interest to TRC. Chevron argues the jury, not the trial court, was required to determine not only whether TRC was entitled to prejudgment interest, but also the amount, the date it began to run, and the specific amount of damages subject to prejudgment interest. TRC claims

79

Chevron waived[19] these issues by failing to object and, in any event, Chevron's arguments are incorrect. We consider forfeiture first and, finding the challenges was forfeited, do not reach the merits.

Chevron submitted the final proposed verdict form, which asked only whether the jury awarded each of the respective parties' interest, in the event it awarded damages to that party. Chevron also argued in closing that the jury should award Chevron prejudgment interest as part of its affirmative claim. TRC argues these facts show Chevron did not object to the verdict form and forfeited any objections not raised until after the verdict was returned.

### 1. Legal Principles Governing the Timeliness of Objections

"An objection to jury verdict forms is generally deemed waived if not raised in the trial court." (*People v. Toro* (1989) 47 Cal.3d 966, 976, fn.6, overruled on other grounds in *People v. Guiuan* (1998) 18 Cal.4th 558.) "Frequently, failure to object to the form of a verdict before the jury is discharged has been held to be a waiver of any defect. [Citations.] However, waiver is not automatic, and there are many exceptions. [Citations.] [¶] Waiver is not found where the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy.' " (*Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 456, fn. 2; see *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 (*Jensen*).)

The parties cite two cases that, at first glance, suggest a split of authority among the Courts of Appeal on when such an objection must be raised. In *Jensen*, BMW's

---

**19** "Waiver" and "forfeiture" sometimes are used interchangeably. (*People v. Simon* (2001) 25 Cal.4th 1082, 1097, fn. 9.) They are different because (1) waiver refers to the intentional relinquishment or abandonment of a known right and (2) a forfeiture results from the failure to make a timely assertion of a right or objection. (*Ibid.*)

counsel first learned of the alleged defect in the special verdict form when the verdict was read, but counsel subsequently offered no explanation why an objection was not raised at that time. (*Jensen*, *supra*, 35 Cal.App.4th at p. 131.) In that situation, the Third District concluded BMW had forfeited its objection by failing to raise it before the court discharged the jury. (*Ibid.*) Its rationale was that the trial court could have corrected any defect in the verdict form and sent the jury back to complete its deliberations had the objection been raised before discharge. (*Ibid.*)

In comparison, in *All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212 (*All-West Design*) this court stated: "Appellants have not waived the right to challenge the use of the verdict forms by failing to argue against them prior to their submission to the jury. They timely preserved the issue by raising it at their motion for new trial." (*Id*. at p. 1220, citing *Tri-Delta Engineering, Inc. v. Insurance Company of North America* (1978) 80 Cal.App.3d 752, 758 (*Tri-Delta*); *Mixon v. Riverview Hospital* (1967) 254 Cal.App.2d 364, 376–377 (*Mixon*).) This conclusory, two-sentence discussion of the timeliness of the challenge can be read in different ways. It might be interpreted as adopting a broad rule of law that applies to all challenges to verdict forms and deems them timely if raised in a motion for new trial. Alternatively, it could be read more narrowly as concluding only that, in the circumstances presented, the appellant's challenges were timely. Applying well-established principles for interpreting appellate opinions, we conclude the only reasonable interpretation is the latter. Under those principles, "any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered." (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2.) Thus, each statement in an opinion must be considered in its proper context and given an objectively reasonable interpretation. (*V Lions Farming, LLC v. County of Kern* (2024) 100 Cal.App.5th 412, 423.)

The statements in *All-West Design* that "Appellants have not waived" and "[t]hey timely preserved" are specific to those litigants and, thus, dependent upon their particular circumstances. (*All-West Design*, *supra*, 183 Cal.App.3d at p. 1220.) Neither statement attempted to set forth a rule of law of general application. In other words, the statements are merely the court's conclusion about how the law applied to the appellants. It is not objectively reasonable to extrapolate from those statements that, contrary to the cases cited as support, this court was adopting a broad rule of law holding any challenge to a verdict form is timely if raised for the first time in a motion for new trial.

In *Mixon*, the court observed, in relation to a waiver argument, that "[p]rior approval of the form of a verdict or a failure to object to the form of verdict submitted to a jury has often been held to be a waiver of any defect in the form." (*Mixon*, *supra*, 254 Cal.App.2d at p. 376 [collecting cases].) Thus, the court identified a general rule about the timeliness of objections to a verdict form. The court also stated the failure to object before the jury's discharge "has not in every case worked automatically against" the appellant. (*Id.* at pp. 376–377 [citing cases permitting later objections].) This statement acknowledges exceptions to the general rule and was reiterated when the court, after reviewing the cases, stated: "It is clear, therefore, that it is not universally true that clarification of a verdict must be made before the jury has been discharged." (*Id.* at p. 377, italics added.) Because *Mixon* contained an extensive discussion of cases, *All-West Design*'s citation to *Mixon* and its silence on the various principles of law governing the timeliness of challenges to verdict forms should be read as accepting *Mixon*'s discussion of those principles, not contradicting them. Accordingly, *All-West Design*'s terse resolution of the timeliness question should be interpreted as applying an exception to the general rule that objections are untimely if not raised before the jury is discharged.

The citation to *Tri-Delta* likewise does not support a different interpretation of *All-West Design*. In *Tri-Delta*, the court did not directly comment on the issues of waiver or

82

timeliness. Instead, it dealt with a patently ambiguous jury verdict which was the subject of great dispute between the parties. Both parties apparently first raised the issue of proper interpretation of the jury's verdict after the jury was discharged. (*Tri-Delta*, *supra*, 80 Cal.App.3d at p. 757.) However, neither party argued these issues could not be raised after trial because of waiver or untimeliness. The court, having no reason to discuss the general timeliness rule and its exceptions, considered the merits of the challenges to the verdict.

In *All-West Design*, a key question was whether the tiered special verdict forms were too indefinite, such that they allowed the jury to return punitive damages against cross-defendants on an improper basis, namely by awarding punitive damages on a cause of action for which the jury awarded no actual damages. (*All-West Design*, *supra*, 183 Cal.App.3d at p. 1220.) The jury generally followed the verdict forms, filling in answers to questions appropriately and finding cross-defendants liable on two different causes of action. (*Id.* at p. 1221.) However, in assigning damages, the jury wrote cross-defendants were liable for $1,625 in damages for the first cause of action, and on the second wrote "No Further Damages." (*Ibid.*) The cross-defendants asserted this was a finding of "zero" damages and, as a result, the jury's award of punitive damages on the second cause of action could not stand. (*Id.* at pp. 1222–1223.) Because the jury wrote something unanticipated on the verdict forms, neither party would nor should have foreseen it. Thus, *All-West Design* is properly interpreted as applying an exception to the general timeliness rule and not as establishing the principle that challenges to the verdict forms are always timely if raised in the posttrial motion for new trial.

### 2.     *Chevron's Objections Were Untimely*

We next consider whether Chevron's objections to the verdict form are subject to the general rule and thus untimely or, alternatively, whether those objections fall within an exception that allows them to be raised after the jury was discharged.

83

Here, Chevron argues it did raise objections about the evidentiary findings necessary to award prejudgment interest prior to the verdict form being approved. We are not convinced. Chevron points to two different places in the record during which the issue of prejudgment interest arose, both times as an aside during colloquies between the court and the attorneys about the demonstratives to be used by various expert witnesses, which included amounts to be awarded as prejudgment interest in them. TRC's counsel stated in passing their view that it was appropriate for the jury to either award or not award prejudgment interest, but the amount was to be calculated by the court, since the jury could award many different amounts of damages, which would correspondingly change the amount of prejudgment interest. In this context, Chevron's counsel made their own passing reference to a different point of view, noting, "my understanding of the law is a little bit different, the jury can award zero prejudgment interest, some of the prejudgment interest, or all of the prejudgment interest." Later, when the issue came up again in connection with a different witness, Chevron's counsel said, "Actually, I believe that's incorrect. We'll deal with that when you want to raise it." However, nothing else is identified in the record for us in relation to prejudgment interest, indicating Chevron never raised a clear objection to the verdict form on the record.

Chevron ultimately provided the final verdict form that was substantially adopted, which included simple yes or no questions as to whether the jury wished to award prejudgment interest to TRC or Chevron, respectively. Chevron asserts this was not *its* verdict form, but the result of numerous off-the-record conferences about jury instructions and verdict forms. Assuming this is true, it does not help Chevron's argument. The record does show the parties were working on an agreed-upon verdict form, which is typical and expected. Parties often meet and confer with each other, sometimes with the trial judge, about proposed jury instructions and verdict forms. Many disputes, both major and minor, are resolved in these conferences, with a view toward

84

putting forth as many jointly agreed-upon instructions and verdict forms as possible. Usually, after these conferences, if objections persist, the court will invite the parties to place those objections on the record. This in fact happened in this case, and Chevron submitted later written objections to a number of *jury instructions*, after the case was submitted to the jury. Critically, Chevron placed no objections to the verdict form on the record. The first time an actual issue was raised by Chevron to the verdict form's presentation of interest to the jury was *after* trial, during argument on the motion for new trial.

In these circumstances, we conclude Chevron did not timely object to the verdict form and, as a result, forfeited the objections it now raises. An exception to the general rule does not apply because nothing about the jury's answer to any question was unexpected. The verdict form included two questions related to prejudgment interest: (1) "If you answered 'no' to Question 2, do you award TRC prejudgment interest?" and (2) "If you answered 'no' to Question 2, do you award Chevron prejudgment interest?" The jury checked "Yes" for the first question and, because it had found Chevron failed to prove its claims against TRC, left the answer to the second question blank. These answers followed the direction in the verdict form and, thus, were not a surprise. Furthermore, because the verdict form treated each party the same, the lack of objections from Chevron can be regarded as a tactical choice about how it wanted its claim for prejudgment interest handled by the jury and the trial court.

Consequently, no exception to the general rule requiring objections before the jury is discharged applies and Chevron's objections are untimely. It follows that we do not reach the merits of Chevron's arguments about the need for further jury findings to support the award of prejudgment interest.

## DISPOSITION

The order granting Chevron's motion for new trial is reversed and the order denying Chevron's motion for JNOV is affirmed. The matter is remanded to the trial court with directions to vacate the order granting a new trial, to reinstate the judgment and to conduct any further necessary proceedings not inconsistent with this opinion. TRC shall recover its costs on appeal.

Chevron's December 29, 2022 request for judicial notice of items of legislative history is granted.

FRANSON, J.

WE CONCUR:

HILL, P. J.

DE SANTOS, J.